**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 00-51265

_____

PV PATEL, MD, individually; PV PATEL, MD, A Professional
Association; THE HEART CENTER; ECHO LAB
INCORPORATED; ASSOCIATES OF MIDLAND
CARDIOVASCULAR AND INTERNAL MEDICINE, A
Professional Association, also known as Midland Cardiovascul,

                                        Plaintiffs - Appellants-Cross-Appellees,

versus

MIDLAND MEMORIAL HOSPITAL AND MEDICAL CENTER;
ET AL,

                                        Defendants,

MIDLAND MEMORIAL HOSPITAL AND MEDICAL CENTER;
MEMORIAL HEART AND VASCULAR INSTITUTE; PERMIAN
CARDIOLOGY GROUP; STEPHEN BROWN, MD; MICHAEL
MILLER, MD; JAY MENDEZ, MD; DONALD LOVEMAN, MD;
HAROLD RUBIN,

                                        Defendants - Appellees - Cross-
                                        Appellants

_____

Appeals from the United States District Court
for the Western District of Texas

_____

July 10, 2002

Before JONES, EMILIO M. GARZA, and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

P.V. Patel, M.D., ("Dr. Patel") filed suit in district court against Midland Memorial Hospital and several of its doctors (collectively "the Defendants") for claims arising out of the hospital's summary suspension of all of his clinical privileges in January 1999.[1]  Specifically, Dr. Patel alleged that the Defendants, by participating in the suspension of his privileges: (1) denied him pre-suspension due process in violation of 42 U.S.C. § 1983 (2000); (2) engaged in racial discrimination in violation of 42 U.S.C. § 1981 (2000); (3) engaged in an illegal monopoly and attempted to monopolize in violation of 15 U.S.C. §§ 1 & 2 (2000) and TEX. BUS. & COM. CODE ANN. § 15.05 (Vernon 2001); and (4) engaged in conduct that constituted breach of contract, defamation, and interference with contractual relationships.  The district court granted the Defendants' motion for summary judgment on all of Dr. Patel's claims.  Dr. Patel now appeals on the ground that genuine issues of material fact exist with respect to all of his claims.  The Defendants cross-appeal arguing that under the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. §§ 11101-11152 (2000), they are immune from all of Dr. Patel's claims, except for his civil rights claims, and are entitled to reasonable attorneys' fees.

**I**

Dr. Patel is a board-certified cardiologist who specializes in invasive and interventional cardiology.[2]  He joined the staff of Midland Memorial Hospital ("Midland"), a public hospital, in

---

[1]Four associations in which Dr. Patel has an interest—P.V. Patel, M.D., Professional Association; The Heart Center; Associates of Midland Cardiovascular & Internal Medicine, Professional Association; and Echo Lab, Inc.—were also named plaintiffs in the suit.

[2]Invasive cardiology includes angiograms or studies on the coronary arteries in a cardiac catheterization laboratory.  Interventional cardiology includes procedures on coronary arteries in a cardiac cath lab, including the placement of a balloon or angioplasty, the placement of stents, and

1982. While at Midland, he continuously expanded his practice by obtaining new clinical privileges and increasing the volume of procedures he performed. By the mid-1990s, he performed one of the highest numbers of cardiac interventions of the hospital staff. Dr. Patel also expanded his practice outside of Midland by maintaining a practice at Odessa Medical Center and opening his own cardiac cath labs and primary care clinics, at times competing with Midland and members of its staff. For fifteen years, Dr. Patel appears to have practiced successfully without any significant problems.

Two incidents in 1997 and 1998, however, drew the attention of Midland's Medical Executive Committee (MEC) to Dr. Patel's practice. In November 1997, the MEC investigated an altercation between Dr. Patel and a nurse in front of a patient just before a procedure. Questions were raised as to whether Dr. Patel properly secured the patient's consent to continue with the procedure and whether he waited for a new nurse to arrive before beginning the procedure. The MEC ultimately suspended Dr. Patel's clinical privileges for fourteen days and ordered him to undergo a behavioral evaluation.

Six months later, the MEC received its second complaint regarding Dr. Patel's practice. The chairman of Midland's Department of Radiology reported to the MEC that Dr. Patel had "an inordinate number of catastrophic outcomes" among his recent cases of noncardiac peripheral vascular interventions. The MEC directed an ad hoc committee of eight cardiology, vascular surgery, and radiology physicians to review Dr. Patel's problematic cases. After reviewing three cases handled by Dr. Patel in the preceding eight months, the committee reported several concerns to the MEC. Specifically, the committee cited concerns regarding Dr. Patel's technical performance of procedures, his intra-procedure decisionmaking, and the accuracy of his documentation. The MEC then met to

---

rotablater therapy.

discuss the cases and the committee's report, and voted unanimously to revoke Dr. Patel's noncardiac peripheral privileges. While a post-suspension hearing was pending, the MEC sought independent review of three of Dr. Patel's cases by two outside experts. Both confirmed that the revocation was appropriate.[3]

At the same meeting during which it revoked Dr. Patel's peripheral privileges, the MEC charged the Cardiovascular Committee with reviewing Dr. Patel's diagnostic and interventional cardiac procedures "to ensure that a similar pattern is not emerging." In response, Stephen Brown, M.D., Chair of the Cardiology Committee, reviewed the last six fatalities in cases handled by Dr. Patel. In a report made to John Foster, Jr., M.D., Chairman of the MEC,[4] Dr. Brown noted several concerns with each of the cases and concluded that Dr. Patel's management of them warranted further investigation. He recommended sending the cases for outside review to avoid any issues of bias on the part of Dr. Patel's competitors. As a result, Dr. Foster sent ten of Dr. Patel's cardiology cases to Richard A. Lange, M.D., Director of the Cardiac Catheterization Laboratory at the University of Texas Southwestern Medical Center at Dallas, for outside review.

_____

[3]The MEC sent records from Dr. Patel's cases to Richard L. Vogelzang, M.D., Professor of Radiology and Chief of Vascular and Interventional Radiology at Northwestern Memorial Hospital in Chicago, Illinois, and Frank J. Rivera, M.D., Department of Radiology Imaging at Baylor University Medical Center in Dallas, Texas. Dr. Vogelzang stated in his report that Dr. Patel "lacks basic technical skill in the performance of [peripheral interventions]," "lacks understanding of the clinical management of peripheral vascular disease," and "has had an unusually and unacceptably high rate of major complications and catastrophic outcomes." Dr. Vogelzang also noted "significant and marked discrepancies" in Dr. Patel's recordkeeping, including a report that a patient had "returned to his home in an improved condition," when in fact he had died. Dr. Rivera similarly criticized Dr. Patel's basic knowledge, skills, and judgment in performing peripheral interventions. With respect to Dr. Patel's record keeping, Dr. Rivera reported: "Because of the severity of the discrepancies, one cannot help but be concerned that these are not simple errors, but in fact a blatant attempt to give false information."

[4]Although initially named as a defendant, Dr. Foster has since been dismissed from this case.

-4-

While Dr. Lange conducted his outside review, the Cardiovascular Committee continued its inside review. At its bi-monthly meeting to review the morbidity/mortality cases of cardiologists at the hospital, the Committee reviewed Dr. Patel's recent morbidity/mortality cases and noted a "high concentration of severe complications."[5] The Committee then forwarded a report to Dr. Foster stating that Dr. Patel was "not operating in a safe fashion" while performing certain coronary procedures and that the situation was "very dangerous."[6] The report again recommended outside review by an unbiased third party, and potentially a reevaluation of Dr. Patel's privileges depending on the outcome of that report.

Dr. Foster then requested that the Medical Control Committee (MCC)[7] review the Cardiovascular Committee reports regarding Dr. Patel's cardiology cases. The MCC met to discuss the cases, but decided to wait for the results of Dr. Lange's review, which were expected within the week, before acting. One week later, Dr. Lange reported to Dr. Foster that six of the ten patients whose cases he reviewed died as a "direct result of an interventional procedure" that was performed by Dr. Patel: (a) without clear indication, (b) with poor technical skills, or (c) in coronary vessels poorly suited for the procedure. Dr. Lange also found problems in the cases that suggested poor medical judgment. Two days later, the MCC reviewed Dr. Lange's report and voted to recommend

[5]Although the Committee included thirteen members at the time of the meeting, the only three doctors in attendance were Dr. Brown, Dr. Miller, and Dr. Barnett, all members of the Permian Cardiology Group and competitors of Dr. Patel's. Dr. Barnett was initially named a defendant in this case, but has since been voluntarily dismissed.

[6]The Committee's report was written by Dr. Miller, but was submitted to the MEC under Dr. Brown's name.

[7]The MCC consists of the chiefs of each section in the Department of Medical Services and other members of the Department of Medicine appointed by the department chairman.

the suspension of all of Dr. Patel's privileges. Upon the MCC's request, the MEC met to consider the evidence and the recommendation for suspension. After deliberation, the MEC unanimously approved the MCC's recommendation that Dr. Patel's privileges be summarily suspended.[8]

Dr. Patel was notified of his suspension by letter. The MEC then informed him that he had a right to a post-suspension hearing under Midland's Fair Hearing Plan. Dr. Patel immediately requested a full due process hearing and the hospital offered to provide one two weeks later. Thereafter, an Ad Hoc Hearing Committee ("Hearing Committee") held ten meetings in which Dr. Patel and the hospital submitted documentary evidence and testified regarding the events leading up to the suspension and the hospital's continued concerns about the quality of Dr. Patel's practice. After hearing testimony from eight physicians and reviewing over 125 exhibits, the Hearing Committee ultimately concluded that Dr. Patel was not a danger to his patients. Instead, the Hearing Committee faulted Dr. Patel's inadequate documentation—including his failure to note on patients' records major complications that occurred during procedures—for the questionable appearance of his cases. As a result, the Hearing Committee recommended that Dr. Patel's clinical privileges be restored, but that he be placed on probation for six months to ensure that he prepare timely and accurate medical records for each of his patients at Midland. Although the Hearing Committee recommended restoration of his privileges, it also held that there were "reasonable grounds" for the action taken by the various doctors and hospital committees reviewing Dr. Patel's cases prior to the suspension. In addition, the Hearing Committee held that the participating doctors acted "in

[8]Only two of the defendants in this case participated in this vote—J.E. Mendez, M.D., Midland's Chief of Staff and Chairman of the MEC, and Donald Loveman, M.D., Chairman of the MCC. Two other defendants attended the meeting, but could not participate in the vote—Harold Rubin, Pharm. D., Midland's President and CEO since 1991 and a non-voting member of the MEC, and Dr. Brown.

reasonable belief that such action was in furtherance of quality health care," and "in reasonable belief that [action] was warranted by the facts known after a reasonable effort to obtain the facts." Finally, the Hearing Committee held that Dr. Brown, Dr. Miller, and Dr. Lange—the authors of three of the reports reviewing Dr. Patel's cases—"acted at all times without malice, without fraudulent or wrongful intent, and without any ulterior or improper motive."[9]

After his privileges were restored, Dr. Patel filed suit against Midland, four of the eleven members of the MEC who voted to suspend him, the three cardiologists reviewing his cases on behalf of the Cardiovascular Committee, the Permian Cardiology Group, and Memorial Heart and Vascular Institute.[10] Specifically, Dr. Patel alleged that, by contributing to his suspension, the Defendants: (1) denied him pre-suspension due process in violation of 42 U.S.C. § 1983; (2) engaged in racial discrimination in violation of 42 U.S.C. § 1981; (3) engaged in an illegal monopoly and attempted to monopolize in violation of 15 U.S.C. §§ 1 & 2 and TEX. BUS. & COM. CODE ANN. § 15.05; and (4) engaged in conduct that constituted breach of contract, defamation, and interference with contractual relationships. The district court dismissed all of Dr. Patel's claims on summary judgment,

_____

[9]The Hearing Committee did not review the MEC's 1998 suspension of Dr. Patel's peripheral privileges, which were still suspended at the time oral argument was heard on this case.

[10]Dr. Patel named the following Midland doctors as defendants: 1) Dr. Foster, Chairman of the MEC in 1998; 2) Dr. Rubin, Midland's President and CEO since 1991, and a non-voting member of the MEC; 3) Dr. Loveman, Chairman of the MCC; 4) Dr. Mendez, Midland's Chief of Staff and Chairman of the MEC in 1999; 5) Dr. Brown, Chairman of Midland's Cardiovascular Committee; 6) Dr. Miller, a member of the Cardiovascular Committee; and 7) Dr. Barnett, a member of the Cardiovascular Committee. Dr. Patel later voluntarily dismissed Drs. Foster and Barnett as defendants in this case. In addition to Midland and the individual doctors, Dr. Patel named Memorial Heart and Vascular Institute ("Memorial Heart") and the Permian Cardiology Group as defendants. Memorial Heart operated a cardiac catheterization laboratory in Midland between March 1998 and December 1999. The Permian Cardiology Group, of which Drs. Brown, Miller, and Barnett are members, competes with Dr. Patel at Midland for cardiology services.

-7-

but failed to reach the Defendants' claim for immunity and attorneys' fees under HCQIA. Both sides now appeal.

## II

We review a district court's grant of summary judgment de novo. *Grenier v. Med. Eng'g Corp.*, 243 F.3d 200, 203 (5th Cir. 2001). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). On a motion for summary judgment, a court must review the facts in the light most favorable to the non-movant. *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000).

On appeal, Dr. Patel contends that he has presented sufficient evidence to create genuine issues of material of fact with respect to all of his claims. After reviewing the evidence in the record and the relevant law, we disagree. We address each claim separately below.

## III

Dr. Patel first contends that the district court erred in granting summary judgment in favor of the Defendants on his procedural due process claim.[11] Specifically, he argues that, as a matter of law, due process required that he receive notice and some opportunity to be heard on the allegations

---

[11]It is undisputed that Dr. Patel had a protected property interest in his clinical privileges at Midland Memorial Hospital, a political subdivision of the State of Texas. As a result, Dr. Patel could not constitutionally be deprived of those privileges without due process of law. We assume without deciding that Dr. Patel's January 1999 suspension is a deprivation to which the protections of due process apply. *See Gilbert v. Homar*, 520 U.S. 924 (1997) (assuming without deciding that a suspension infringes on a protected property interest).

-8-

against him before his clinical privileges could be suspended.[12]  Because Midland and the doctors

deprived him of such process prior to his January 1999 suspension, he argues that he is entitled to

relief under 42 U.S.C. § 1983.[13]

Dr. Patel is correct that due process generally requires notice and an opportunity to be heard

prior to the deprivation of a protected property interest.  *See, e.g., Cleveland Bd. of Educ. v.*

*Loudermill*, 470 U.S. 532, 542 (1985).  It is well settled, however, that "[p]rocedural due process

is a flexible concept whose contours are shaped by the nature of the individual's and the state interests

in a particular deprivation."  *Caine v. Hardy*, 943 F.2d 1406, 1412 (5th Cir. 1991) (en banc); *Gilbert*,

520 U.S. at 929.   In some cases, "where a state must act quickly, or where it would be impractical

to provide predeprivation process," postdeprivation process is enough to satisfy the requirements of

due process.  *Gilbert*, 520 U.S. at 930.

We have previously considered en banc the pre-suspension process due a physician where

patient safety was considered to be at risk.  In *Caine v. Hardy*, an anesthesiologist at a public hospital

was suspended after an investigation of the death of one of his patients revealed serious deficiencies

in his performance.  *Caine*, 943 F.2d at 1407-08.  Believing that Dr. Caine posed a danger to his

patients, the hospital suspended him without first affording him a formal hearing.  We held that, under

such exigent circumstances, where the safety of the public is at risk, an adequate post-suspension

remedy satisfies the requirements of due process.  *Caine*, 943 F.2d at 1412.

---

[12]To be sure, Dr. Patel only challenges as inadequate his *pre*-suspension process.  He concedes that his *post*-suspension hearing comported with the requirements of due process.  He also does not challenge the process afforded him, both before and after, his 1997 and 1998 suspensions.

[13]Section 1983 creates a cause of action against any person who, under color of law, "subjects, or causes to be subjected," a person "to the deprivation of [a constitutional right]."  42 U.S.C. § 1983.

In the case before us, the MEC had ample reason to believe that Dr. Patel's methods posed a danger to patient safety. As an initial matter, concern for Dr. Patel's cardiology interventions developed in connection with an investigation of deficiencies in his peripheral intervention practice and a suspension of those privileges. The MEC then initiated an investigation of Dr. Patel's cardiology practice to protect against similar dangers. At the time the MEC voted to suspend Dr. Patel's privileges, it had before it a report from Dr. Brown asserting serious concerns with Dr. Patel's performance; a report from the Cardiovascular Committee finding a "high concentration of severe complications" in Dr. Patel's recent morbidity/mortality cases; an outside review from Dr. Lange concluding that six of the ten patients whose cases he reviewed died as a "direct result of an interventional procedure" performed by Dr. Patel; and the recommendation of the MCC, after independently reviewing the cases discussed in the Cardiovascular Committee's report, that Dr. Patel's privileges be suspended immediately. In light of the consistent findings before the MEC, the MEC reasonably concluded that it had no choice but to act quickly to protect patient safety.[14] Because pre-suspension process was not practical under these circumstances, Dr. Patel's due process

[14]In an effort to call into question the reason given for his suspension—patient safety—Dr. Patel attempts to discredit the individual reports relied upon by the MEC. Specifically, Dr. Patel challenges the credentials of his reviewers and questions the fact that each reviewer examined only a small percentage of his cases. Although Dr. Patel may be correct that a more thorough investigation would have shown him not to be a danger, this possibility does not affect the reasonableness of the MEC's investigation under the difficult circumstances of this case. As noted above, the MEC took several steps to substantiate its concerns prior to making its final decision to suspend. It sought several separate reviews of Dr. Patel's cases in order to obtain different perspectives before making its decision. It also specifically sought an additional review by a doctor outside the hospital, who was not in direct competition with Dr. Patel, to avoid any appearance of bias. The reviewers consistently found Dr. Patel to be an imminent danger and suggested that the consequences of delaying action could be life-threatening. Under these circumstances, when time was of the essence, we believe the MEC reasonably relied on the evidence before it when suspending Dr. Patel.

rights were not violated.

Dr. Patel contends that *Caine* does not resolve the question of whether he received adequate pre-suspension process in this case for two reasons. First, he argues that the summary judgment record includes substantial evidence that he did not pose an "imminent danger" to patients at the time of his suspension. Specifically, he notes that he did not have a significant malpractice record, that his overall morbidity/mortality rate for cardiology intervention was the lowest at Midland in 1997 and 1998, and that five experts defended his technical skills and past performance at his post-suspension hearing. He also notes that the Hearing Committee unanimously recommended that his privileges be reinstated. At the very least, Dr. Patel contends, this evidence creates a genuine issue of material fact for summary judgment purposes.

Although we acknowledge the evidence presented by Dr. Patel that he was not *actually* dangerous at the time of his suspension, we believe Dr. Patel focuses on the wrong issue. When determining the amount of process constitutionally due Dr. Patel prior to the January 1999 suspension of his privileges, the key question is not whether Dr. Patel was *actually* a danger, but whether the MEC had reasonable grounds for suspending him as a danger. *Gilbert*, 520 U.S. at 933 (stating that the purpose of pre-suspension process, assuming it is even required, is "to assure that there are reasonable grounds to support the suspension"). We have already determined that, based on the evidence before it, the MEC had such grounds. The fact that Dr. Patel was later able to produce evidence to rebut the reports before the MEC does not call into question the reasonableness of the MEC's conclusion at the time it voted to suspend him. As a result, Dr. Patel's attempt to create a fact issue with respect to whether he was actually dangerous fails.

Second, Dr. Patel argues that even if we find that he was a danger at the time of his

suspension, *Caine* requires more pre-suspension process than he was actually afforded. Specifically, he notes that the physician in *Caine* had some notice of the investigation against him and that he was able to attend two informal meetings relating to the charges prior to his suspension. Dr. Patel contends that, according to the rule set forth in *Caine*, he was entitled to similar treatment before his suspension.

We disagree with Dr. Patel's reading of *Caine*. Although Dr. Patel is correct that the doctor in *Caine* happened to receive some notice of the charges against him prior to his suspension, *Caine* did not create a pre-suspension process requirement where patient safety is at risk. On the contrary, *Caine* makes clear that "[n]ot even an informal hearing . . . must precede a deprivation undertaken to protect the public safety." *Caine*, 943 F.2d at 1412.

Because, under the particular circumstances of this case, prompt action was necessary to secure patient safety, we conclude that Dr. Patel received all the pre-suspension process he was constitutionally due. As a result, the district court properly granted summary judgment to the Defendants on this issue.[15]

**IV**

In his second point on appeal, Dr. Patel argues that the district court erred when it granted summary judgment to the Defendants on his race discrimination claim. Specifically, Dr. Patel argues that genuine issues of material fact exist as to the real reason for his suspension. According to Dr. Patel, the Defendants did not suspend him because he was dangerous, but rather because he was

---

[15]Because we conclude that Dr. Patel's due process rights were not violated, we do not address the individual defenses raised by Midland and the doctors to liability under § 1983.

Indian.  As a result, he argues that he is entitled to relief under 42 U.S.C. §§ 1981 & 1983.[16]

The summary-judgment test for discrimination claims under § 1981 and § 1983 is the same as the test for discrimination claims under Title VII.  *Pratt v. City of Houston*, 247 F.3d 601, 605 n.1 (5th Cir. 2001).  To survive a summary judgment motion, the plaintiff must first present a prima facie case of discrimination.  *See id.* at 606 n.2.  If established, a prima facie case raises an inference of discrimination, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse decision.  *Id.* at 606.  If the defendant presents such a reason, then the inference disappears, and the plaintiff must offer evidence that the proffered reason is a pretext for racial discrimination.  *Id.*

Assuming *arguendo* that Dr. Patel has presented a prima facie case of discrimination, Midland and its doctors have proffered a legitimate, nondiscriminatory reason for his suspension.  Specifically, they contend that his privileges were suspended because of concerns for patient safety.  Thus, in order to survive summary judgment, Dr. Patel must proffer sufficient evidence of pretext to create a question of fact for the jury that race, rather than patient safety, was the real reason for his suspension.  *Id.*

Dr. Patel first attempts to show pretext by presenting evidence of what he alleges is a pattern of discrimination against him by Midland and its doctors.  According to Dr. Patel, his January 1999 suspension was only the latest example of the "aggressive and unfair competition" waged against him

_____

[16]Since Dr. Patel filed his principal brief, we have held that § 1981 does not provide a remedial cause of action against local government entities and local government officials in their official capacities.  *Oden v. Oktibbeha Cty.*, 246 F.3d 458, 463 (5th Cir. 2001).  Recognizing that *Oden* forecloses his discrimination claim against at the very least, Midland, Dr. Patel asks in his reply brief for leave to seek a discrimination remedy under 42 U.S.C. § 1983.  For purposes of this appeal, we will assume *arguendo* that he has proceeded under both sections.

from the time he joined Midland. In the early 1980s, he notes an incident during which the hospital declined his offer to open a cardiac cath lab. According to Dr. Patel, the hospital's former CEO stated that "he would never do it with a foreign doctor." The hospital later opened a cath lab with a white doctor. Throughout the 1990s, Dr. Patel contends that Midland repeatedly took steps to expand its operations to directly compete with, and impede the development of, his practice.[17]

These instances of competition do not create a question of fact regarding pretext in this case. As an initial matter, Dr. Patel fails to offer any evidence linking his 1999 suspension to these earlier events. More importantly, even if Dr. Patel could connect these events to his 1999 suspension, he still fails to create a question of fact for the jury that *race* motivated his suspension. *See Price v. Fed. Exp. Corp.*, 283 F.3d 715, 723-24 (5th Cir. 2002) (requiring evidence of pretext supporting "an inference that racial discrimination was the real reason for the employment decision"); *Pratt*, 247 F.3d at 606 ("After a [discrimination] case reaches the pretext stage, the question for summary judgment is whether a rational fact finder could find that the employer discriminated against the plaintiffs *on the basis of race*." (emphasis added)). With only one exception, Dr. Patel fails to present any evidence connecting any of Midland's competitive moves to racial animus. The only instance cited by Dr. Patel that might provide evidence of racial animus—where the former CEO of Midland declined to open a cath lab with a "foreign doctor"—took place more than a decade before his

---

[17]In his brief on appeal, Dr. Patel notes five examples of Midland's alleged competitive strategy against him: In 1990, the hospital bought the building where Dr. Patel operated an imaging center and "moved his business out and replaced it with its own imaging center." In 1992, after he opened a primary care clinic in Big Springs, Texas, the hospital opened its own primary care clinic there. In 1996, Dr. Patel opened a primary care clinic in Midland, Texas, and the hospital opened a clinic across the street. In 1997, the hospital signed a long-term lease for a building in Kermit, Texas that Dr. Patel was trying to buy for another clinic. Later that same year, after Dr. Patel opened another cath lab, the hospital formed a joint venture with Permian Cardiology Group and two other cardiologists to open a cath lab in direct competition with Dr. Patel's new lab.

suspension. The former CEO who allegedly made the statement is not a party to this case and does not appear from the record to have had any involvement in Dr. Patel's 1999 suspension. Based on this evidence, no rational factfinder could conclude that Dr. Patel was suspended on account of his race.[18]

Dr. Patel also attempts to show pretext vis-à-vis three racist comments made by members of Midland's staff during the late 1990s. First, in either 1996 or 1997, Dr. Patel alleges that Dr. Miller referred to him twice as a "sand nigger" and stated that he was "probably parking his camel." Dr. Miller then scheduled one of his non-emergency patients ahead of one of Dr. Patel's patients for a procedure. Dr. Miller later wrote the Cardiovascular Committee's report criticizing Dr. Patel's handling of cases and describing him as "very dangerous." Second, in 1997 or 1998, Dr. Patel alleges that another person at Midland who was probably a cardiologist made the following statement: "[Dr. Patel] is nothing but a god damn Indian quack and I want him out of here. I want his ass out of here." Finally, soon after the second comment was made, an administrator allegedly stated, after hearing a complaint about the room conditions of one of Dr. Patel's patients, that "he didn't care

_____

[18]Dr. Patel also suggests that the inadequacy of the investigation into his practice evinces pretext. Specifically, he contends that, in light of the summary judgment evidence that he was not a danger at the time of his suspension, a rational factfinder could conclude that the investigation into his practice was a sham. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (stating that in some cases, a "trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose"). We disagree. Because we have already concluded that the MEC's decision to suspend was objectively reasonable based on the evidence before it, and that it had no reason to doubt the apparent quality of that evidence, the evidence of "falsity" here is not sufficient to create an inference that patient safety was merely a cover for discriminatory intent. *Id.* at 148 (noting that there will be "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory").

about that."[19]

These statements also fail to create a fact issue regarding the reason for Dr. Patel's suspension. Specifically, Dr. Patel has not shown that these statements are more than "stray remarks." *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 222-25 (5th Cir. 2001) (applying stray remarks doctrine where evidence of pretext was weak). We recently explained the stray remarks doctrine in *Rubinstein v. Adm'rs of the Tulane Educ. Fund*:

> [I]n order for comments in the workplace to provide sufficient evidence of discrimination, they must be "1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue."

218 F.3d 392, 400-01 (5th Cir. 2000) (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir.1996)). The comments cited by Dr. Patel fail to meet these criteria for several reasons.

First, we note that Dr. Miller's alleged statements were made two or more years before Dr. Patel was suspended. Although they are directed at Dr. Patel's Indian descent, they do not relate to any plans to investigate his practice or suspend his privileges. *See Brown*, 82 F.3d at 655-56 ("Comments that are vague and remote in time are insufficient to establish discrimination." (internal quotations and citations omitted)). Moreover, Dr. Miller had no authority over the decision to suspend Dr. Patel. *See Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996) ("To be probative, allegedly discriminatory statements must be made by the relevant decision maker."). Dr.

---

[19]In its opinion, the district court noted that Dr. Patel alleged in his First Amended Complaint that Dr. Mendez made the following statement at the time of his suspension: "you foreign doctors are required to dot every *i* and cross every *t*, unlike nonforeign doctors." *See* Amended Order at 11. Dr. Patel does not mention this alleged statement in either of his briefs on appeal, or in any of his responses to the Defendants' summary judgment motion. Nor can we find any testimony supporting this allegation in any of the affidavits submitted by Dr. Patel. As a result, we must credit Dr. Mendez's undisputed affidavit denying that he made this comment.

Miller's role in Dr. Patel's suspension was limited to the report he drafted on behalf of Dr. Brown and the Cardiovascular Committee, which recommended outside review of Dr. Patel's cases. Dr. Miller was not a member of the MEC—the body that voted to suspend Dr. Patel—nor was he a member of the MCC—the body that recommended suspension. Finally, the statements made by the unidentified speaker and the administrator cannot support an inference of discrimination. They do not appear to be related to Dr. Patel's suspension, nor can they be linked to an individual with authority over Dr. Patel's suspension.[20]

Because Dr. Patel has failed to present sufficient evidence of pretext from which a rational factfinder could infer racial discrimination, the district court properly granted summary judgment to the Defendants on this issue.[21]

---

[20]We note that, in addition to failing to establish pretext, Dr. Patel has failed to present sufficient evidence from which a rational factfinder could conclude that Midland had a custom or policy of racial discrimination. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding that a municipality can only be found liable under section 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"); *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir. 1999) ("Liability arises only when the execution of an official policy or custom of the municipality causes the constitutional injury."). In his brief on appeal, Dr. Patel concedes that Midland has no policy of racial discrimination. He argues instead that the fact that Dr. Miller and other hospital staff felt free to make racially derogatory comments creates a fact issue as to whether the hospital had a custom of discrimination. We disagree. First, as noted above, there is no evidence that Midland was aware of any of the comments cited by Dr. Patel. Second, the undisputed evidence in the record defies any alleged custom of racial discrimination against Indians. At the time of his suspension, 59 of Midland's 329 physicians were of Indian descent, and roughly one hundred doctors had foreign degrees. Physicians of Indian descent have also served on hospital committees and in positions of authority. For example, Dr. Prem Gupta, a member of the MCC who voted in favor of suspending Dr. Patel's privileges, is of Indian descent. The current Chief of Staff and Chairman of the MEC, Dr. Raj Reddy, is also of Indian descent.

[21]Because Dr. Patel has presented insufficient evidence of discrimination to survive summary judgment, we need not address the individual defenses raised by Midland and the doctors based on lack of causation and immunity.

# V

Dr. Patel next argues that the district court erred in granting summary judgment to the Defendants on his federal and state antitrust claims. *See* 15 U.S.C. §§ 1 & 2; TEX. BUS. & COM. CODE ANN. § 15.05. Specifically, he argues that his suspension was the product of a conspiracy to monopolize the Midland market for the "performance of interventional and invasive cardiology services."[22] According to Dr. Patel, the Defendants suspended him so that they could succeed to his market share and block the further expansion of his practice—including the opening of a new hospital to compete with Midland. Dr. Patel contends that the Defendants' actions caused injuries redressable by the antitrust laws because they essentially removed him from the market for eleven months, led to higher costs and fewer options for consumers, and delayed his plans to open a competing hospital.

To support his antitrust claim, Dr. Patel cites the same pattern of competition that he relied on in connection with his discrimination claim. *See infra* note 17 and accompanying text. According to Dr. Patel, after the Defendants' previous attempts to block the expansion of his practice failed, they resorted to directly attacking his clinical privileges. In addition to past examples of aggressive competition, Dr. Patel once again argues that the fact that he was not a danger further illustrates that his suspension was a "sham" undertaken to destroy his reputation and practice. Finally, Dr. Patel notes that at least some of his reviewers—specifically, Drs. Brown and Miller, both members of the Permian Cardiology Group—were cardiologists at Midland who directly competed with his

---

[22]According to Dr. Patel, the relevant geographic market in this case is Midland, and the relevant product market is the "performance of interventional and invasive cardiology services." Dr. Patel avers that at the time his practice came under scrutiny in 1997, he (and the plaintiff-associations in which he has an interest) performed at least fifty percent of these services in Midland. Drs. Brown and Miller, both part of the Permian Cardiology Group at Midland, performed thirty-five to forty percent of these services. For purposes of this appeal, we assume *arguendo* that these averments are correct.

cardiology practice.

The district court properly granted summary judgment to the Defendants on Dr. Patel's antitrust claims for three reasons. First, Dr. Patel has failed to present sufficient evidence from which a rational factfinder could conclude that he was suspended for anticompetitive reasons. To begin, the mere fact that Dr. Patel and Midland competed in the past does not itself support a finding that his suspension was a sham. This is particularly true where, as here, the record supports the hospital's reasonable belief that Dr. Patel was a danger to patients at the time of his suspension.[23] Moreover, Dr. Patel's complaint that his direct competitors participated in his investigation is of little consequence here. It is inevitable in any peer review process that a physician's competitors will at some point be involved in the process. As Dr. Patel himself implicitly concedes, only specialists from the same field can fairly assess a physician's cases.[24] Finally, we note that the Defendants here took several steps to ensure that the quality of its peer review process was not tainted by competitive bias. Drs. Miller and Brown, though critical of Dr. Patel's cases, both recommended outside review before taking action against Dr. Patel. The hospital followed these recommendations and sought an outside review by Dr. Lange. In addition, Midland's procedures provided for review by doctors of various disciplines within the hospital. Furthermore, Dr. Patel's competitors did not control the ultimate

---

[23]We also note the lack of evidence connecting this alleged "pattern" of anticompetitive behavior with the individual defendants in this case. At best, the evidence presented by Dr. Patel suggests that Dr. Rubin, who did not participate in the vote to suspend Dr. Patel, had some degree of involvement in Midland's competing ventures.

[24]One of Dr. Patel's key criticism of his reviewers is that they did not have sufficient expertise in invasive and interventional cardiology to fairly review his cases.

decision to suspend his privileges.[25]

Second, Dr. Patel's antitrust claims fail as a matter of law because he has not alleged a cognizable antitrust injury. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."). Dr. Patel's suspension did not eliminate him as a competitor. He still continued to treat many of his patients at another facility during the time of his suspension.[26] Moreover, his suspension did not permanently block his plans to open a new hospital, but at best delayed them.

Third, the Local Government Antitrust Act of 1984 (LGAA), and its Texas counterpart, bar Dr. Patel from recovering antitrust damages from Midland and its doctors acting in their official capacities. *See* 15 U.S.C. §§ 34-36 (2000); TEX. BUS. & COM. CODE ANN. § 15.05(g) (Vernon Supp. 2001). The LGAA provides, in relevant part:

> No damages, interest on damages, costs or attorney's fees may be recovered [for violations of antitrust laws] in any claim against a person based on any official action directed by a local government, or official or employee thereof acting in an official capacity.

15 U.S.C. § 36(a). Because it is undisputed that Midland is a political subdivision of the State of Texas, and that the doctors in this suit were acting as agents of the hospital when investigating Dr.

---

[25]Dr. Patel does not allege that any of the five members of the MCC who recommended suspension, or any of the eleven members of the MEC who voted to suspend him, were direct competitors. He simply makes broad accusations that, because of the hospital's history of competing with his new ventures, we should presume his suspension was the result of anticompetitive motives.

[26]Dr. Patel continued to treat several of his patients at Odessa Medical Center.

Patel's cases, they are immune from antitrust liability.[27]

## VI

Lastly, Dr. Patel argues that the district court erred when it granted summary judgment to the Defendants on his three state law claims—breach of contract, tortious interference with contract relations, and defamation. We disagree.

First, Dr. Patel argues that Midland's bylaws constituted a contract between Midland and its doctors that was breached when he was suspended without first being afforded process. Specifically, Dr. Patel argues that, because he was not *actually* a danger, Midland's bylaws required that he be afforded notice and a hearing prior to the deprivation of his privileges. Even assuming the existence of a contract in this case, summary judgment was still proper on this claim because Midland's bylaws were not violated. Although Dr. Patel is correct that Midland's bylaws generally provide for notice and an opportunity to be heard prior to the deprivation of privileges, that is not the case where, as here, patient safety is deemed to be at risk. Midland's bylaws specifically authorize summary suspension "whenever a practitioner's conduct requires that immediate action be taken to prevent immediate danger to . . . patients."

Second, Dr. Patel claims in vague terms that the Defendants defamed him by disseminating "false and defamatory per se publications to third parties." Specifically, he argues that these publications falsely stated that the summary suspension was justified to protect patient safety. Because we have already concluded that the MEC had reasonable grounds for concluding that Dr. Patel was a danger and thus that his summary suspension was justified under the circumstances,

---

[27]Because we have already concluded that summary judgment was proper on these claims, we do not need to reach the Defendants remaining defenses based on sovereign immunity and the state-action doctrine.

summary judgment was proper on this claim.[28] TEX. CIV. PRAC. & REM. CODE ANN. § 73.005 (Vernon 2001) ("The truth of the statement in the publication on which an action for libel is based is a defense to the action.").

Third, Dr. Patel claims that the Defendants, by illegally suspending him, interfered with his business and contractual relations with the hospital, as well as with his business relationships with other physicians, patients, and insurance carriers. This claim also fails. To begin, we have already determined that Dr. Patel's suspension was not illegal. Moreover, we note that it is undisputed that Midland, through its agents, had a duty to engage in peer review of its physicians. Thus, as the district court correctly concluded, any contractual interference caused by Midland's exercise of this right with respect to Dr. Patel was justified. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996) ("A party is justified in interfering with another's contract if it exercises (1) its own legal rights or (2) a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken.").

## VII

Finally, we note the Defendants' contention that they are immune to all of Dr. Patel's claims, except for his civil rights claims, under the Health Care Quality Improvement Act and the Texas Peer Review statutes. *See* HCQIA, 42 U.S.C. §§ 11101-11152 (providing immunity from damages to any person participating in a professional review action when the proceeding meets certain statutory

---

[28]In his response to Defendants' summary judgment motion, Dr. Patel asserted for the first time a claim for libel based on an "adverse action report" sent to the National Practitioner Data Bank stating that his noncardiac peripheral privileges had been "revoked" when they had only been suspended. Even if this claim was properly considered by the district court, Dr. Patel does not renew this claim in his brief on appeal. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

requirements); Texas Medical Practice Act, TEX. OCC. CODE ANN. § 160.010(1) (Vernon 2001); TEX. HEALTH & SAFETY CODE ANN. § 161.033 (Vernon 2001) (providing immunity to members and agents of medical peer review committees absent a showing of malice). In addition, the Defendants argue that both the federal and the state statutes entitle them to attorneys' fees.[29]

Because we agree with the district court's resolution of Dr. Patel's claims on the merits, we need not reach the issue of whether the HCQIA or the Texas Peer Review statutes immunize the Defendants in this case. As for the question of whether attorneys' fees should be awarded to Defendants, we remand this case to the district court for consideration of this issue.

## VIII

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to the Defendants on all of Dr. Patel's claims. We REMAND this case to the district court for a determination of their entitlement to attorneys' fees and defense costs under the HCQIA, 42 U.S.C. § 11113, and the Texas Peer Review statutes, TEX. OCC. CODE ANN. § 160.008(c).

---

[29]Under HCQIA, a defendant who meets the standards for immunity under the statute and substantially prevails shall be awarded costs, including reasonable attorneys' fees, "if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith." 42 U.S.C. § 11113. Under Texas's Peer Review statutes, a defendant may recover costs and attorneys' fees, if the plaintiff's suit was frivolous or brought in bad faith. TEX. OCC. CODE ANN. § 160.008(c) (Vernon 2001).