# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 7, 2009

Charles R. Fulbruge III
Clerk

07-10555

KAY ANN WOOTEN; RONNIE LEMUEL WOOTEN

Plaintiffs-Appellants

v.

FEDERAL EXPRESS CORPORATION

Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Texas
(04-CV-1196)

Before HIGGINBOTHAM, STEWART, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Kay (Katie) Wooten and Ronnie Wooten were long-time employees of Federal Express in the Dallas/Fort Worth area. The Wootens allege that because of their interracial relationship,[1] their co-workers and supervisors harassed them, disciplined them, denied them positions for which they were qualified, and ultimately terminated their employment.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Katie is Caucasian and Ronnie is African American.

The Wootens brought their claim in the United States District Court for the Northern District of Texas. The court granted summary judgment to FedEx on some claims and sent the rest to trial. A jury found for FedEx on all counts. The Wootens timely appealed.

I

Katie Wooten began working at FedEx as a part-time courier in May 1984 in Garland, Texas. After becoming a full-time courier, she successfully applied to transfer to the Dallas Fort Worth Ramp Transit Station in March 1999, working as a part-time ramp transport driver and then in a part-time night heavyweight freight delivery position. Ronnie began working for FedEx in October1993 and had a similar trajectory, moving from part-time courier to full-time ramp transport driver and finally to part-time night heavyweight freight delivery. He worked at the same station as Katie.

Katie and Ronnie began dating in May 2000, and married in June 2001.[2] They allege that before and after they married, co-workers subjected them to frequent teasing, comments, and insults related to their relationship, including some related to their interracial status.

From about the time they started dating, and intensifying after their marriage, their work situation deteriorated. They clashed with their co-workers and supervisors more and more often, until the situation came to a head in 2003, with several conflicts with co-workers, attendant meetings with managers, and formal grievance and disciplinary processes. Their status as an interracial couple came up several times in the course of these dealings with co-workers and managers – although, as we will discuss, it was not a prominent component of

---

[2] Katie was at the time separated from her husband, who at the time worked at her same station. They divorced in February 2001.

the tensions, the meetings, the complaints, or the other formal and informal contacts between the Wootens and FedEx.

On December 16, 2003, FedEx fired Ronnie for receiving his third disciplinary "performance reminder" for a delivery failure, but after Ronnie complained of failure to abide disciplinary procedural rules, senior management reduced the discipline to a five-day suspension without pay. Nine weeks later, FedEx fired both of them for falsifying records and driving outside of their delivery area.

Katie and Ronnie each filed an Equal Employment Opportunity Commission complaint on March 5, 2004, alleging that they were discharged because of their interracial relationship in violation of Title VII of the Civil Rights Act of 1964. Ronnie's complaint included allegations of harassment and discrimination dating from September 2001. The EEOC issued a right-to-sue letter and this suit followed. The Wootens allege violations of Title VII, the Texas Commission on Human Rights Act, 42 U.S.C. § 1981, and the common law tort of intentional infliction of emotional distress.

By order of January 7, 2007, Judge Sidney A. Fitzwater of the United States District Court, in a careful, sixty-six page Memorandum opinion, dismissed the TCHRA claims, Katie and Ronnie's hostile work environment claims, their Title VII failure to promote claims, Katie's retaliation claims under Title VII, Ronnie's discipline/suspension claim under Title VII and § 1981, and some of their retaliation claims. The court allowed Katie's 2002 failure to promote claim under § 1981, both Wootens' discriminatory termination claims, and some retaliation claims of both. On January 31, the court dismissed from the remaining claims the claims for intentional infliction of emotional distress. The remaining claims went to trial. A jury returned a verdict in FedEx's favor, and the district court entered judgment for FedEx.

II

The Wootens appeal the district court's grant of summary judgment on their hostile work environment claims, Ronnie's discriminatory discipline claim, and Ronnie's retaliatory termination claim.

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[3]  On evaluating a motion for summary judgment, "[w]e resolve doubts in favor of the nonmoving party and make all reasonable inferences in favor of that party."[4]  "No genuine issue of material facts exists if the summary-judgment evidence is such that no reasonable juror could find in favor of the nonmovant."[5]  We review grants of summary judgment de novo, because the issue is one of legal sufficiency.[6]

A

Ronnie Wooten claims he raised an issue of material fact as to a separate discriminatory punishment claim, for his termination of December 2003, which was subsequently reduced to a week suspension with partial back pay.  The district court granted summary judgment on this claim insofar as it was separate from Ronnie's later discriminatory termination claim, characterizing it as "essentially a component of the termination claim . . . ."  For essentially the

---

[3] FED. R. CIV. P. 56(c).  The language of this subsection was amended effective December 1, 2007, after the district court's consideration of the summary judgment, but the change is not material for purposes of our review.

[4] *Jenkins v. Methodist Hosps. of Dallas*, 478 F.3d 255, 260 (*quoting Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006)).

[5] *Jenkins*, 478 F.3d at 260.

[6] *Hockman v. Westward Commc'ns*, 407 F.3d 317, 325 (5th Cir. 2004) (*citing Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 9731 (5th Cir. 1999)).

reasons it stated, we hold that the district court rightly judged that the latter termination, which the court allowed to go forward, was the crux of the claim, and that the Wootens otherwise failed to raise a genuine issue of material fact sufficient to allow a separate suspension claim to go forward.

B

To establish a hostile work claim, plaintiffs must demonstrate (1) that they were the members of a protected group, (2) that they were the victim of uninvited harassment, (3) that the harassment affected a "term, condition, or privilege" of their employment, and (4) that the employer knew or should have known of the harassment and failed to take prompt remedial action.[7] "To be actionable, the challenged conduct must create an environment that a reasonable person would find hostile or abusive."[8] "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[9]

The test requires that plaintiffs prove that a reasonable juror could find that the abusive conduct was severe or pervasive. The district court appears to

---

[7] *See Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000), *abrogated on other grounds by Burlington Northern & Santa Fe Ry.Co. v. White*, 548 U.S. 53 (2006).

[8] *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996)

[9] *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993); *see E.E.O.C. v. WC&M Enterprises*, 496 F.3d 393, 399-402 (5th Cir. 2007).

have rested its judgment on the fact that the Wootens failed to raise any genuine fact as to whether the conduct in question was "severe or pervasive."[10]

Many of the allegations that the Wootens claim should have survived summary judgment involve the behavior of their co-worker Tony Garrett, an African-American man who served as freight coordinator at the station (an hourly-paid, non-managerial post[11]). The allegations involve frequent inappropriate comments by Garrett and other individuals in the office,[12] as well

---

[10] The test involves an "or" and not an "and." "Title VII provides a legal remedy to victims who establish that the abusive conduct was severe *or* pervasive." *Harvill v. Westward Commc'ns*, 433 F.3d 428, 434-35 (5th Cir. 2005) (providing citations to support the "or" as opposed to "and," and noting that this is not "an irrelevant distinction"). At times the district court erred and misstated the test as requiring severe *and* pervasive conduct; but multiple times elsewhere it stated and applied the test correctly. In any case, our review is de novo, and we affirm on the merits, applying the proper test.

[11] While they argue it repeatedly, the Wootens do not successfully demonstrate that Garrett was in fact a supervisor; even after considerable discovery, they merely assert that he "was given the authority by FedEx to assign the drivers' deliveries and make decisions regarding their workload." But the involvement of numerous other supervisors is clear throughout the record, as are the limits of Garrett's powers (for instance, Katie Wooten admitted in deposition that he had no power to discipline her or evaluate her performance).

On the other hand, FedEx construes language from *Faragher v. City of Boca Raton*, 524 U.S. 775, 803 (1998) ("to hire and fire and set work schedules") (*quoting* Estrich, *Sex at Work*, 43 STAN. L. REV. 813, 854 (1991)), as if it laid out a necessary condition of a "supervisor" relationship, which it plainly does not. And of course, there may be de facto supervisors who do not bear that title. Not all exercise of authority leads to an inference of a supervisory relationship, particularly when close monitoring is close at hand from other direct supervisors and managers. Some interdependence and inequality in authority among employees in a corporate enterprise is inevitable: not all dependence amounts to a legally sufficient "supervisor" relationship. No doubt, Garrett's actions influenced the Wootens' daily work environment, and thus his actions are serious, but based on the evidence before us Garrett was a co-worker and not a supervisor.

[12] At deposition, Ronnie testified concerning the racial overtones of some of the comments made (by some women who worked in the office and by Garrett) about his and Katie's relationship, before and after they began dating. The most favorable testimony for the Wootens is this (emphases added):
Q: After you started dating what people made comments to you about – that referred to the fact that it was an inter-racial couple?
A: Well . . . this was like *probably every other day with Tony Garrett*. And this is how my morning would basically get started probably every other day for probably – probably up to the time me and her got married . . . in 2001. . . . You

6

know, I'd come in and, you know, they be in [the break room]. Charlotte and sometimes Craig Harris will be in there. And Greg Arbet will be in there. . . . And I'll walk in there they'll go, "Hey man, you know, here come Ronnie Wooten. Ronnie Wooten said he'll never date another black woman again." And that was just about – I mean that was just about every other day. I would come in and – and he would do that. . . . .

Q: Tony Garrett would say that?

A: Oh, yeah. Just about every other day. . . . And Regina said, "The only reason Ronnie would mess with a white woman is because they'll do – them bitches will do anything you tell them to do." And I'm sitting there going like, "Oh, whatever man." And like I said, me and Katie Wooten wasn't seeing each other then. . . .

Q: So this was before you were seeing each other?

A: This is before. Yeah, this is before. . . . And then after we – you know, like Katie [testified], you know, they talk about the jungle fever. That – you know, I'd come in and Tony go, "Oh, here come Ronnie Wooten." And he'll sing the jungle fever song.

Q: He'd sing the song Jungle Fever?

A: Yeah. And he'll go back to the same statement, you know, "Ronnie said he'll never date another black woman again." And then all of a sudden Regina got to the point where she got tired of Tony saying it, you know, "I'm tired of hearing it." And shit – "take that shit somewhere else." And I don't know, I – he still didn't get the picture, but I mean up to – probably up to the time we got married he was – that was his famous line when I – when I come in. . . .

Q: Okay. Were you pretty much known in the work place as a person that liked to kid around with his co-workers? . . .

A: Yeah. We played around a little bit.

Q: Including Tony Garrett?

A: Me and Tony – I've been knowing Tony since I was a DAL since 1993, so – we used to play basketball together and –

Q: So he was a person that you joked around with in the work place?

A: No, I wouldn't say that. . . . I joke around with everybody. It's not – it's not a common practice that I do. Basically, when I come in I come to get my stuff – get my pouch, go get my truck and I load it. But no, when I come in, no, I don't actively go out and say, "Hey, let's – let's joke around." . . . What you're referring to when Tony would joke around like that, no, I didn't – I used to tell Tony, "Okay. That's enough." With the – you know, all Ronnie say he won't date another black woman again. I didn't like hearing that. I didn't like it. And I told Tony, "Okay, Tony, that's enough." . . .

Q: . . . *Did you ever report what Tony Garrett, the kind of things that he said, to any manager before you were married to Katie Wooten?*

*A: No. . . .*

*Q: And did – after you were married could you tell me about any comments or conduct that you think occurred as harassment because you were in an inter-racial marriage?*

*A: I can't think of anything right now.*

7

as by oppressive actions of Garrett regarding work assignments.[13] Garrett's comments involve race: "jungle fever," a phrase made famous by the Spike Lee movie of that name,[14] is a reference to interracial romantic attraction.[15] And in context, especially when Ronnie reports that he asked Garrett to stop, a reasonable juror could see it as more than mere teasing; it can be understood to express a core of virulent and longstanding disapproval of interracial romantic relationships. The butt of such "jokes" would be understandably sensitive, and could reasonably interpret the remarks as hostile, even intimidating. But deposition testimony suggest that the comments by Garrett tapered off or ceased after the Wootens' marriage, before any complaints about possible interracial discrimination to management. Thus, even if the district court was wrong and the comments could amount to "severe or pervasive" abusive workplace conduct,

---

Katie Wooten testified, apparently also about Tony Garrett:
> The main thing he said several times was jungle fever. "Y'all got that jungle fever going on." He would put – swing that into sentences several times. More than several times . . .
> Q: Well, how many?
> A: Throughout a two-year period?
> Q: Yeah.
> A: Probably heard it 10 or 11 times.

[13] Inter alia, Katie claimed that Garrett would assign her more deliveries, and more spread out deliveries, than her peers, that he would assign her physically demanding "lift gate" deliveries from which female drivers were usually spared, and that on a number of occasions he affixed labels backwards on heavy delivery items, making each delivery more strenuous. Later, the Wootens claim, Garrett offered to, and did, begin giving them deliveries close to their home so they could go home for lunch: he then reported them to supervisors for their spending time at home while on the job. After the Wootens complained about his actions, Garrett allegedly physically and verbally confronted Ronnie in response to his and Katie's complaints.

[14] JUNGLE FEVER (Universal Pictures 1991). The Stevie Wonder song "Jungle Fever" from the movie's soundtrack was also a hit song.

[15] *See Jenkins*, 478 F.3d at 265 (favorably citing case law to the effect that courts must take notice, in discrimination claims, of racial "code words").

Ronnie's failure to put management on notice contemporaneously would doom this part of the Wootens' claim.

As far as the allegedly oppressive work assignments, construing the deposition testimony in the Wootens' favor, the actions themselves were largely or entirely race-neutral. The Wootens' complaints as to these actions similarly offer only brief glimpses of allegations of possible prejudice against their interracial relationship,[16] and any inference of racial animus appears to be entirely subjective, not supported by any comments or actions.[17]

We stand in an uncomfortable but familiar place for courts adjudicating discrimination claims, faced with inappropriate, offensive remarks not legally sufficient to sustain a claim. The difficulty of evaluating discrimination claims at the summary judgment stage is well known and derives from obvious sources,

---

[16] The written complaints in evidence do not reflect concerns about inter-racial prejudice. There is some testimony about complaints relating to race. One part of Katie's deposition testimony, concerning her complaints to one supervisor, Sue Walsh, ran thus:

Q: You told Sue Walsh that you thought that you were being treated differently by Tony Garrett because you were in an inter-racial marriage?
A: Because of that and he didn't – he didn't like me.
Q: Who didn't like you?
A: Tony.
Q: How many times did you tell Sue Walsh that you thought that Tony Garrett was doing this because you were in an inter-racial marriage.
A: Probably once.
Q: When?
A: I didn't tell her all the time.
Q: When?
A: I told her – I complained about the problems all the time.
Q: I want to know how much – you said you told her once that it was because it was an – because you were in an inter-racial marriage. When did that happen?
A: I don't know. It was sometime when she had come there in that year.
Q: And never again after that?
A: I really couldn't tell you.
Q: Do you know what the subject was that you were complaining about? The specific subject?
A: Yeah, it was the distribution of freight.

[17] *See Nichols v. Lewis Grocer*, 138 F.3d 563, 570-71 (5th Cir. 1998).

namely the importance of "he said / she said" credibility determinations. We remain keenly aware that "[w]hether . . . allegations are too vague to ultimately carry the day is a credibility determination, or requires weighing the evidence, both of which are more appropriately done by the trier of fact."[18] That said, there must on the full record of the case at hand be a genuine issue of fact for the jury.

The Wootens offer evidence of workplace incidents, conflicts, and complaints, the vast majority of which do not directly or under any reasonable inference involve racial animus. The connection between Garrett's and other co-workers' race-based comments, and the more serious workplace actions such as unfavorable shifts and so on, is weak to non-existent. There is thin evidence that possible racial discrimination was complained about, amidst many other complaints, and well after the brunt, and perhaps after all, of the racial comments and innuendo had abated.[19]

We would not lay down a rule that verbal comments could never lead to inferences of racial motivation; nor do we hold that frequent racial comments, even meant in jest, cannot support a finding of hostile work environment; nor, finally, do we intend to establish a new baseline for what sort of comments and conduct do not qualify as "severe or pervasive."[20] Close analysis of the summary

---

[18] *Harvill*, 433 F.3d at 436 (5th Cir.2005).

[19] *See, e.g., Machinchick v. PB Power, Inc.*, 398 F.3d 345, 353 (5th Cir. 2005) ("We have found that purely indirect references to an employee's age . . . can support an inference of age discrimination) (*citing Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507 n.4 (5th Cir. 1988)); *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("It is . . . important in hostile work environment decisions that lack a linkage of correlation to the claimed ground of discrimination."); *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 62-66 (D.D.C. 2003) (finding no inference of racial discrimination on facts presented); *Terry v. Ashcroft*, 336 F.3d 128, 147-150 (2d Cir. 2003) (allowing for inference of racial motivation for daily supervisory harassment, in circumstances more extreme than the instant case).

[20] In the same spirit, we recognize that prior cases finding hostile work environments, which often furnish quite egregious examples, "do not mark the boundary of what is

judgment evidence presented is required in these cases,[21] and such analysis, of a voluminous amount of evidence in this case, especially the time line of racial comments, adverse actions, and complaints, here leads us to our answer, inescapably.

As for the alleged hostile work environment created by Peyton, insofar as it must be separated from the claims regarding Garrrett, this claim too must fail because of the utter lack of demonstration that race was involved in Peyton's animus. True, the harassment seems to have begun in temporal proximity to a complaint that the Wootens were the objects of racial discrimination, but close examination of the evidence in record, including the Wootens' own complaints about Peyton, fail to raise any genuine possibility that Peyton was herself motivated by racial animus. There is no evidence that any dislike or unfavorable treatment was racially motivated. However obnoxious her behavior may have been, no reasonable juror could find that it was tied to race.

C

The Wootens apparently seek review of the district court's summary judgment on Ronnie's retaliation claim relating to his December 2003 suspension, commuted to a two-day suspension. We are not persuaded that this claim is separate from the retaliation claim that was allowed to proceed. The Wootens offer no citation to any point where the district court erred.

III

---

actionable." *Harris*, 510 U.S. at 22. The Second Circuit's comment applies equally in this circuit: "Prior cases in which we have concluded that a reasonable juror could find that the work environment was objectively hostile do not 'establish a baseline' that subsequent plaintiffs must reach in order to prevail." *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 606 (2d Cir. 2006).

[21] *See, e.g., Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 269-71 (5th Cir. 1998).

The Wootens seek relief on numerous other grounds, including the prejudicial admission of irrelevant evidence, failure to render a judgment as a matter of law or order a new trial, and the failure to strike a racially biased venire member for cause. All of these grounds are preserved in some form in the record below and are reviewed for abuse of discretion. Appellants also claim their trial was tainted by perjury and subornation of perjury, leveling charges at witnesses and counsel for the appellees. All of these claims are meritless.

## A

The district court refused to strike venire member Paul for cause, forcing the Wootens to exercise a peremptory strike against Paul, leaving them unable to strike a possibly racially biased venire member, schoolteacher Morris.

The voir dire relevant to the challenge of Paul ran thus:

THE COURT: Hello, Mrs. Paul. You indicated that you had strong feelings about interracial marriage; is that correct?
PROSPECTIVE JUROR PAUL: Well, --
THE COURT: Unless I confused you with Mrs. Ivie.
PROSPECTIVE JUROR PAUL: I think you did.
THE COURT: Do you know of any reason you can't be fair and impartial in this case?
PROSPECTIVE JUROR PAUL: Well, no. I think I could be.
THE COURT: All right. I think I confused you with Mrs. Ivie.
     Do you have any questions?
MS. LASTER:[22] I had the same note, ma'am. Are you sure you didn't say you had strong feelings about interracial relationships? Because I wrote that down for you as well as Ms. Ivie.
PROSPECTIVE JUROR [PAUL]:[23] Well, I believe a robin should be with a Robin [sic], but there are a lot of people that are marrying interracially, and so I can't – I can't live their life for them. I have to live mine.

_____

[22] Counsel to the Wootens.

[23] The court reporter here apparently typed "Ivie" for "Paul." We make the appropriate substitutions in the remaining transcript portion.

MS. LASTER: Okay. So you do have feelings that interracial relationships are not right?

PROSPECTIVE JUROR [PAUL]: It's just not for me, and my family. I'll just put it that way.

MS. LASTER: Okay.

PROSPECTIVE JUROR [PAUL]: But, you know, that's somebody else's prerogative, that's fine. I don't hold anything against 'em.

THE COURT: Would you have any difficulty in – if I instruct you that the law prohibits discrimination based on interracial relationships, you have any problem applying that law?

PROSPECTIVE JUROR [PAUL]: No.

. . . [Prospective juror exits.]

THE COURT: Is there any challenge to the juror?

MS. LASTER: Yes, judge. She lied, for one thing. I heard it and you heard it, and my clients heard her say the first time she had strong feelings about interracial relationships, and gets up here and says she doesn't at first and finally admits it. I don't trust anything she said through the whole voir dire process.

THE COURT: I'm not sure it was a lie. There are jurors who hear things or misunderstand things for a number of reasons, and I'll overrule the motion.

Paul's striking statement of her conviction that "a robin should be with a Robin [sic]" – a quasi-proverbial statement insinuating that interracial marriage is somehow unnatural, contrary to the order of things – obviously has bearing on the Wootens' case, given the centrality of their interracial relationship to their claims. Despite this, in light of Paul's affirmation that she could be impartial and keep her personal preferences to herself, the court refused to strike her for cause. It was then the Wootens' decision to spend a peremptory to strike Paul, leaving them unable to strike Morris, a schoolteacher, whose voir dire ran thus:

COURT: Is there anyone on the panel who has ever personally been accused of discrimination or retaliation, whether that accusation was right or wrong, had merit or no merit whatsoever?
All right. On the first row, Mrs. Morris.
 . . .
PROSPECTIVE JUROR MORRIS: I'm a school teacher. I'm always prejudiced. Everything I do.

13

> THE COURT: Okay.  And now let me ask you, is there anything about that that you think would prevent you from being fair and impartial in this case?
> PROSPECTIVE JUROR MORRIS: No.
> THE COURT: All right.  Thank you.

Morris's comment suggests that she had been accused of prejudice or bias, but that she thought it in the normal course of her occupation to be accused of such things.  There was no further investigation of why she might think this or how it might affect her judgment, and the record as it stands does not clearly establish that she should have been stricken for cause.  The Wootens did not seek to challenge Morris for cause.

The assertion that Morris might have been the object of a peremptory challenge is not probative here.  The Supreme Court has directly held that a "wasted" peremptory does not taint a criminal trial,[24] and its reasoning a fortiori applies here.  There is no error.

B

The Wootens claim the district court abused its discretion in not setting aside the jury verdict, because FedEx failed to rebut the Wootens' prima facie case of discrimination.  There was ample evidence, both testimonial and documentary, that supported FedEx's position, including on the issue of whether "delivery area" had sufficient meaning to support discipline against the Wootens.  The Wootens had every opportunity to test this evidence at trial, and the jury was not unreasonable in finding that FedEx had rebutted the Wootens' allegations of prejudice.

C

---

[24] *See U.S. v. Martinez-Salazar*, 528 U.S. 304, 311-17 (2000); *see also U.S. v. Sanchez-Hernandez*, 507 F.3d 826, 829 (5th Cir. 2007).

The Wooten's quibble with the allegedly erroneous admission of evidence and testimony that they claim was prejudicial to their case. The evidence includes conflicting testimony regarding FedEx's rationales for its decisions, an employment policy document on "falsification" signed by Katie Wooten in November 1990, and damaging notes from co-workers about the Wootens included in a report that was part of FedEx's investigation of the Wootens.[25]

The challenged evidence and testimony were relevant to the central issues tested at trial. While the introduction of some of the evidence was, no doubt, prejudicial to the Wootens, none of it was not unduly so. The Wootens had ample opportunity to attack each piece of evidence at trial, and no doubt their efforts affected the weight the jury assigned evidence in coming to its determination. FedEx's case was not nearly as troubled as the Wootens claim, and the central issues of this trial were carefully and thoroughly explored at trial.

## D

The Wootens' allegations of perjury, subornation of perjury, and misconduct are tenuous at best. Most of these allegations are reviewed for plain error, because they were not raised in the court below. The ones that were are reviewed for abuse of discretion.

The standard of review is of no moment here, because the record below reflects no error. The Wootens' briefs include numerous bits of testimony and argumentation taken out of context. The court gave the Wootens ample opportunity to challenge and undermine misleading testimony, and it properly

---

[25] The precise nature of the Wootens' objections to this evidence is not clear from their appellate briefs; nor was it clear at trial, where objections tended to arrive in packs and be ill explained. For simplicity of analysis, we have here construed each objection as raising the strongest legal theory available, but none carries the day.

instructed the jury regarding the import to be given to the statements of counsel. We find no errors, perjurious statements, or instances of misconduct that call for reversal of the judgment in this case.

AFFIRMED.