United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 31, 2007**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

No. 05-10117

G. MARK JENKINS, MD,

Plaintiff-Appellant,

versus

METHODIST HOSPITALS OF DALLAS, INC.; HOWARD CHASE; JOHN HAUPERT;
JACK BARNETT; KELLY WOLFE; TIM MEEKS; KIM HOLLON,

Defendants-Appellees.

No. 05-10118

G. MARK JENKINS, MD,

Plaintiff,

versus

METHODIST HOSPITALS OF DALLAS, INC., ET AL.,

Defendants,

DONALD H. FLANARY, JR.,

Appellant.

Appeals from the United States District Court
for the Northern District of Texas
(3:02-CV-1823)

Before BARKSDALE, DeMOSS, and PRADO, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

In the first of these two related appeals, Dr. G. Mark Jenkins contests the summary judgment awarded Methodist Hospitals of Dallas, Inc. and affiliated individuals (collectively, Hospital) against his claim under 42 U.S.C. § 1981 (providing equal contract rights for all persons under the law). Among other things, at issue is whether Dr. Jenkins, who is black, failed to establish, sufficient to defeat summary judgment, that intentional discrimination on the basis of race interfered with his ability to make or enforce contracts. At issue in the other appeal is whether the district court abused its discretion in imposing, *sua sponte*, under Federal Rule of Civil Procedure 11, public-reprimand sanctions against Dr. Jenkins' attorney for a misrepresentation in his brief. **JUDGMENT AND SANCTIONS AFFIRMED**.

I.

Dr. Jenkins, a cardiologist, joined North Texas Cardiovascular Associates (NTCA) in 1998, after completing a cardiology fellowship. NTCA in turn had a contractual relationship with the Methodist Hospitals of Dallas to provide cardiac services to patients. Accordingly, shortly after joining NTCA, Dr. Jenkins applied for medical-staff privileges at the Hospital.

Dr. Jack Barnett, then chief of the Hospital's department of medicine, initially opposed the application, purportedly due to Dr.

2

Jenkins' omission of an unsatisfactory item in his medical-training history. When Dr. Barnett's opposition failed to persuade his approval-process colleagues, however, he gave Dr. Jenkins' application his support. Upon being granted staff privileges at the Hospital in late 1998, Dr. Jenkins began working in the cardiac catheterization laboratory (cath lab), where he performed, *inter alia*, primary angioplasty.

The administrative director of the cardiology department testified by deposition that, starting approximately six months after Dr. Jenkins arrived, cath-lab employees communicated to her they felt they were working in a hostile environment. As a result, in mid-2000, she requested a meeting with the cath-lab staff, a human-resources vice president, and the newly-assigned administrator for cardiology. Following that meeting on 12 July, the cardiology administrator: met with Dr. Robert Edmonson, then director of cardiology, and Dr. Barnett, among others; and formed an ad hoc committee to determine whether he should be subject to corrective action.

That committee interviewed a number of cath-lab staff members, cardiology-section members, hospital administrators, and Dr. Jenkins. As stated in a committee document, the committee: concluded "there [was] a hostile environment in the Cath Lab, which is potentially injurious to patient care", due in "large part" to

Dr. Jenkins; and, on 21 July, recommended termination of his medical-staff membership and privileges.

The committee's recommendation was forwarded to the corporate medical board (Board). On 25 July, after meeting that day with Dr. Jenkins, the Board summarily suspended Dr. Jenkins' cath-lab privileges, pending further review.

On 27 July, after further review of the evidence related to Dr. Jenkins' cath-lab conduct, however, the Board recommended that Dr. Jenkins retain his staff membership and privileges *under certain conditions*, such as his acknowledging he created a hostile environment in the cath lab and apologizing both in writing and in person to the cath-lab employees, agreeing to undergo psychiatric evaluation and ongoing counseling from a psychiatrist selected by the Board, and agreeing to the monitoring of his cath-lab behavior for an indefinite period of time by a committee recommended by the Board. Dr. Jenkins agreed to all of the conditions, except evaluation by a Board-chosen psychiatrist; he requested choosing his own.

Accordingly, on 23 August, Dr. Jenkins requested further review by a fair-hearing committee of the medical staff. And, on 7 September, the above-described summary suspension was reported to the national practitioner data bank (NPDB).

Following a hearing in December 2000 and January 2001, the fair-hearing committee unanimously disagreed with Dr. Jenkins'

4

summary suspension and, on 5 February 2001, recommended petitioning the NPDB to void the adverse recommendation. Upon receipt of the fair-hearing committee's report, the Board made a final recommendation on 20 February to reinstate Dr. Jenkins' cath-lab privileges, to establish a monitoring committee, and to petition the NPDB to void the adverse recommendation. In sum, Dr. Jenkins' suspension lasted approximately seven months.

In this action, Dr. Jenkins presented numerous federal and state-law claims against the Hospital. Only one is on appeal: under § 1981, for racial discrimination impairing his ability to make or enforce contracts.

The district court granted summary judgment in favor of the Hospital. For the § 1981 claim at issue, the court held: there was no contract in the record to form the basis of a § 1981 claim; and, even if there were, Dr. Jenkins failed to create a genuine issue of material fact on whether the Hospital had the intent to discriminate against him on the basis of race. *Jenkins v. Methodist Hosps. of Dallas, Inc.*, No. 3:02-CV-1823-M, 2004 WL 3393380 (N.D. Tex. 14 Aug. 2004).

Dr. Jenkins' brief in opposition to summary judgment contained a misstatement in quoting a comment, according to Dr. Jenkins, made to him by Dr. Barnett. Accordingly, pursuant to the show-cause procedure for *sua sponte* sanctions under Rule 11, the court imposed public-reprimand sanctions against Dr. Jenkins' attorney in an

5

opinion.  ***Jenkins v. Methodist Hosps. of Dallas, Inc.***, No. 3:02-CV-1823-M, 2004 WL 2871006 (N.D. Tex. 14 Dec. 2004).

II.

The § 1981 and sanctions issues are addressed in turn.  For the former, Dr. Jenkins failed to show a material fact issue concerning claimed racial discrimination.  For the latter, the district court did *not* abuse its considerable discretion.

A.

A summary judgment is reviewed *de novo*, applying the same standard as the district court.  *E.g.*, **Wheeler v. BL Dev. Corp.**, 415 F.3d 399, 401 (5th Cir.), *cert. denied*, 126 S. Ct. 798 (2005).  Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "We resolve doubts in favor of the nonmoving party and make all reasonable inferences in favor of that party."  **Dean v. City of Shreveport**, 438 F.3d 448, 454 (5th Cir. 2006).  No genuine issue of material fact exists if the summary-judgment evidence is such that no reasonable juror could find in favor of the nonmovant.  *E.g.*, **Mayberry v. Vought Aircraft Co.**, 55 F.3d 1086, 1089 (5th Cir. 1995).

Section 1981 provides:  "All persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens".  42 U.S.C. § 1981.  Section 1981 claims are analyzed

6

under the same framework as Title VII claims. ***Roberson v. Alltel Info. Servs.***, 373 F.3d 647, 651 (5th Cir. 2004).

To defeat summary judgment, Dr. Jenkins was required, *inter alia*, to show a genuine issue of material fact. The following sub-issues concern the underlying process for determining whether he made that material-fact-issue showing.

First, Dr. Jenkins had to establish a *prima facie* case of intentional discrimination. ***Bellows v. Amoco Oil Co.***, 118 F.3d 268, 274 (5th Cir. 1997). He had to show: (1) he is a member of a racial minority; (2) the Hospital had the intent to discriminate against him on the basis of race; and (3) the discrimination concerned the making or enforcement of a contract. ***Id.*** Upon Dr. Jenkins' making this showing, the Hospital was required to articulate a legitimate, non-discriminatory reason for the summary suspension. *E.g.*, ***Rachid v. Jack in the Box, Inc.***, 376 F.3d 305, 312 (5th Cir. 2004). The burden then shifted to Dr. Jenkins to show: either the proffered reason was not true, but rather a pretext for discrimination; or the reason, although true, was only one reason for the suspension, and Dr. Jenkins' race was another motivating factor. ***Id.*** To meet the motivating-factor prong, Dr. Jenkins had to show his race "'actually played a role in [the Hospital's decision-making] process and had a determinative influence on the outcome'". ***Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 141 (2000) (quoting ***Hazen Paper Co. v. Biggins***,

7

507 U.S. 604, 610 (1993)).  Throughout the burden shifting, Dr. Jenkins had the ultimate burden of showing a genuine issue of material fact on whether the Hospital intentionally discriminated against him on the basis of race.  *See id.* at 143.

Dr. Jenkins claims:  by summarily suspending his cath-lab privileges for seven months and reporting this action to the NPDB, the Hospital intentionally discriminated against him and thereby interfered with the making or enforcement of his contracts with the NTCA, patients needing angioplasty, and a different hospital at which he wanted to acquire staff privileges.  (Because Dr. Jenkins contends the suspension of his cath-lab privileges and report to the NPDB interfered with his ability to make and enforce contracts, we first examine whether those actions were racially discriminatory.  If they were not, we need *not* determine whether each defendant separately engaged in racially discriminatory conduct.)  The Hospital responds that the alleged contracts cannot form the basis for a § 1981 claim.  In the alternative, it contends:  the suspension was due, *not* to racial animus, but to concern that Dr. Jenkins was creating a hostile environment in the cath lab which could potentially result in a lower standard of patient care; and it was legally required to report the action to the NPDB.

Essentially for the reasons stated in the district court's extremely detailed and well-reasoned opinion, and assuming Dr.

8

Jenkins made a *prima facie* case of discrimination, he failed to show the requisite material fact issue on whether the Hospital's proffered reason for suspending his staff privileges pending investigation of the alleged hostile-working environment was *not* legitimate and non-discriminatory. Accordingly, we need *not* reach the question of whether the Hospital's actions interfered with his making or enforcement of a contract.

The primary evidence relied upon by Dr. Jenkins for the asserted reason for the suspension's being pretextual and racial bias' being another motivating factor for the Hospital's actions is 11 alleged remarks by individuals affiliated with the Hospital.

> [I]n order for comments in the workplace to provide sufficient evidence of discrimination, they must be "(1) related [to the protected class of persons of which the plaintiff is a member]; (2) proximate in time to the [complained-of adverse employment decision]; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue".

*Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 343-44 (5th Cir. 2002) (alterations in original) (quoting *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000)).

Dr. Jenkins attributes several of the alleged remarks to Dr. Barnett. As a participant both on the ad hoc committee that initially recommended suspension of Dr. Jenkins' cath-lab privileges and in the Board's review of this recommendation, Dr. Barnett was obviously in a position to influence the decision to

suspend Dr. Jenkins. Although Dr. Barnett's alleged remarks about Dr. Jenkins reflect a mistrust of him and his professional capabilities, none shows the requisite racial animus towards him. Dr. Barnett's other alleged remarks were either *not* made in reference to blacks and/or occurred many years prior to Dr. Jenkins' suspension.

The remaining five alleged remarks attributed to persons other than Dr. Barnett likewise do *not* meet Dr. Jenkins' summary-judgment burden. One involved the "probable" use of a racial epithet in reference to Dr. Jenkins off hospital grounds by two individuals, one of whom was a *witness* before the ad hoc committee. This singular alleged remark is insufficient to show the committee's actions were motivated by racial bias. Dr. Jenkins has provided no evidence that witness either wielded power over the committee members or provided inaccurate information the committee relied upon without conducting an independent investigation. *See **Long v. Eastfield Coll.***, 88 F.3d 300, 307 (5th Cir. 1996). Another alleged remark did *not* involve blacks, while another involved a black speaker, neither of which suggests the Hospital's reason was pretextual or motivated by racial bias against blacks. The final two comments were simply opinions, with *no* supporting evidence, that Dr. Jenkins was resented in the cath lab and suspended because he was black.

10

Dr. Jenkins also asserts that a number of other actions by the Hospital indicate its racial motivation, including: the Hospital's failure to call his attention to the cath-lab problem prior to beginning the peer-review process; the claimed bad faith with which the ad hoc committee conducted that review; affidavits showing the claims about his behavior were false; the "gratuitous severity" of his summary suspension; the Board's refusal to negotiate with him regarding the conditions for reinstatement of his privileges; and the unanimous rejection of the charges against him.

The underlying evidence for these assertions, however, does *not* show a genuine issue of material fact on whether the Hospital's summary suspension of Dr. Jenkins was *racially* motivated. That evidence shows the ad hoc committee was formed only after the administrative director of the cardiology department received numerous complaints about Dr. Jenkins' professionalism in the cath lab and called meetings to try to resolve the discord. The rejection of the committee's suspension recommendation does *not* create a material fact issue whether its actions were racially motivated. **Bryant v. Compass Group USA Inc.**, 413 F.3d 471, 478 (5th Cir. 2005) ("[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision".), *cert. denied*, 126 S. Ct. 1027 (2006). Under § 1981, courts are charged only with determining whether such actions were racially discriminatory;

11

where they are not shown to be, courts cannot second-guess the bases for them. *Id.*

B.

For the companion appeal, Donald H. Flanary, Jr. (Jenkins' attorney) challenges the district court's *sua sponte* sanctioning his conduct under Rule 11. In opposition to the Hospital's summary-judgment motion, Jenkins' attorney filed both a response and a supporting brief on 4 November 2003. In presenting the racial discrimination claims, the brief quoted from Dr. Jenkins' affidavit (which was filed with that brief after being signed and notarized at Jenkins' attorney's law firm on the very day the brief was signed).

Dr. Jenkins stated in his affidavit: Dr. Barnett said to him "he [Dr. Barnett] would not let me [Dr. Jenkins] treat his dog". The brief, however, quoted the statement as "Boy, I would not let you treat my dog", wrongly inserting the racially-charged word "Boy" at the beginning of the statement.

Opposing counsel immediately discovered the glaring misstatement and pointed it out in their 19 November 2003 reply brief. Jenkins' attorney, however, did *not* correct this misrepresentation until almost two months later, upon being questioned about it by the district court at a 13 January 2004 summary-judgment hearing. Jenkins' attorney apologized for the

misrepresentation and offered to resubmit the brief with the quotation corrected.

The district court rejected the request and found the conduct "unacceptable" because it changed a comment from one which "on its face has absolutely nothing to do with race" to one that, "was, in fact, racially related". The district court admonished Jenkins' attorney for "put[ting] before the Court a false piece of evidence" and directed him to submit affidavits explaining his and his firm's actions in that regard.

Subsequently, in its 18 August 2004 opinion granting summary judgment, the district court issued a show-cause order to Jenkins' attorney, specifying the conduct at issue. After reviewing the response to that order, the court in a December 2004 opinion held Jenkins' attorney in violation of Rule 11(b)(3) (allegations and factual contentions must have evidentiary support) "for his unprofessional conduct in not verifying the accuracy of the alleged quotation and in not promptly withdrawing it when the error was pointed out in Defendants' Reply Brief". *Jenkins*, 2004 WL 2871006, at *2. The court sanctioned him through a public reprimand in the opinion. *Id.*

In claiming the sanctions were unwarranted, Jenkins' attorney maintains the statement at issue was an inadvertent mistake and *not* the result of serious misconduct. Rule 11 sanctions are reviewed for an abuse of discretion. *Whitehead v. Food Max of Miss., Inc.*,

13

332 F.3d 796, 802 (5th Cir. 2003) (en banc).  As noted in *Whitehead*, this standard is "necessarily very deferential" for two reasons:

> First, based on its familiarity with the issues and litigants, the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11.  Second, the district judge is independently responsible for maintaining the integrity of judicial proceedings in his court and, concomitantly, must be accorded the necessary authority.

*Id* at 802-03. (internal citations and quotation marks omitted).

Rule 11 is designed to "reduce the reluctance of courts to impose sanctions by emphasizing the responsibilities of attorneys and reinforcing those obligations through the imposition of sanctions". *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 870 (5th Cir. 1988) (en banc).  Along that line, attorneys certify to the best of their knowledge that "allegations and other factual contentions [submitted to the court] have evidentiary support". Fed. R. Civ. P. 11(b)(3).

For obvious reasons, the procedure for sanctions imposed *sua sponte* differs from when requested by counsel. *Compare* Fed. R. Civ. P. 11(c)(1)(A) *with* 11(c)(1)(B).  If, after notice and a reasonable opportunity to respond, the court determines Rule 11 sanctions may be warranted, it may *sua sponte* issue a show-cause order specifying the offending conduct and, following a response, may impose sanctions.  Fed. R. Civ. P. 11(c)(1)(B), (c)(3).

14

As hereinafter discussed, "the standard under which the attorney is measured [under Rule 11] is an *objective, not subjective*, standard of reasonableness under the circumstances". **Whitehead**, 332 F.3d at 802 (quoting **Childs v. State Farm Mut. Auto. Ins. Co.**, 29 F.3d 1018, 1024 (5th Cir. 1994) (emphasis added)). Accordingly, an attorney's good faith will *not*, by itself, protect against the imposition of Rule 11 sanctions. **Childs**, 29 F.3d at 1024.

Concerning this objective standard, Jenkins' attorney claims: where, as here, sanctions are imposed *sua sponte*, the standard should instead be whether he acted in *subjective* bad faith, akin to being in contempt of court. He bases this on his not having the 21-day safe-harbor provision he would have had to correct the error under Rule 11(c)(1)(A) for sanctions requested by counsel. *E.g.*, **In re Pennie & Edmonds LLP**, 323 F.3d 86 (2d Cir. 2003).

In this regard, the sanctions imposed in **Whitehead** and **Childs** were pursuant to counsel's motion. The sanctions imposed in **Childs** were under the Rule as amended in 1983, which permitted *sua sponte* sanctions. The amendment in 1993 concerning such sanctions simply added the above-described show-cause procedure. *See* Advisory Committee Notes on FED. R. CIV. P. 11 (1993 Amendments). The rule as amended in 1993 was at issue in **Whitehead**. That opinion makes

15

no distinction between the initiating basis by which sanctions are being considered.

Admittedly, this distinction was *not* at issue in **Whitehead**; but, obviously, the reasons for our abuse-of-discretion standard of review being "necessarily very deferential" are as applicable to *sua sponte* sanctions as to those imposed on motions by counsel. Nor is there any basis for making a distinction based on who initiates the sanctions inquiry. Ultimately, unless the safe-harbor provision is utilized for sanctions requested by counsel, the district court must decide whether to impose them. In each instance, the party subject to sanctions is given the opportunity to show why they should not be imposed.

Accordingly, **Whitehead** and **Childs** are controlling; they require an objective standard. *See also* ***Young v. City of Providence ex rel. Napolitano***, 404 F.3d 33, 38-40 (1st Cir. 2005); ***Kaplan v. DaimlerChrysler, A.G.***, 331 F.3d 1251, 1255 (11th Cir. 2003). In the alternative, Jenkins' counsel maintains sanctions were improper under an objective standard.

In response to the show-cause order, Jenkins' attorney provided the following: An associate in his law firm assumed primary responsibility for drafting the section of the brief containing the misstatement. (On two instances earlier, in the response and supporting brief, the statement was quoted correctly.) The brief was then reviewed by two partners in the firm who

16

checked, among other things, all quotations for accuracy and added supporting record citations. Jenkins' attorney then proofread the brief. Despite these internal-review procedures, the error remained. As noted, approximately two weeks after the brief was filed, the error was brought to Jenkins' attorney's attention by opposing counsel's reply brief.

Of course, Jenkins' attorney does *not* contest either the district court's finding the statement at issue false or that he was responsible because he signed the brief. Instead, he claims an isolated factual error should *not* be the basis of Rule 11 sanctions. Under certain circumstances, however, an isolated factual misrepresentation may serve as the basis for them. *See, e.g.*, **Precision Specialty Metals, Inc. v. United States**, 315 F.3d 1346, 1357 (Fed. Cir. 2003) (affirming a sanction for miscitation and mischaracterization of authority "because, in quoting from and citing published opinions, [counsel] distorted what the opinions stated by leaving out significant portions of the citations or cropping one of them, and failed to show that she and not the court had supplied the emphasis in one of them"*)*.

As stated by the Advisory Committee Note to Rule 11, a lawyer is required to "'stop-and-think' before ... making legal or factual contentions". Advisory Committee Notes on FED. R. CIV. P. 11 (1993 Amendments). Needless to say, this duty is an extremely important one, especially for the situation at issue. As the district court

17

stated, the "erroneous inclusion of the word 'boy' in the statement ... if relied upon by the Court, could have altered the outcome of th[e] ... case". *Jenkins*, 2004 WL 2871006, at *2. *See also Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996) (holding racially-charged "code words" may provide the basis of discriminatory intent by "send[ing] a clear message and carry[ing] the distinct tone of racial motivations and implications").

"Whatever the ultimate sanction imposed, the district court should utilize the sanction that furthers the purposes of Rule 11 and is the least severe sanction adequate to such purpose." *Thomas*, 836 F.2d at 878. For example, an admonition by the court may be an appropriate sanction, in instances where the attorney's sanctionable conduct was not intentional or malicious, where it constituted a first offense, and where the attorney had already recognized and apologized for his actions. *E.g.*, *In re Kelly*, 808 F.2d 549, 552 (7th Cir. 1986) (issuing a formal warning because "the [offending paper] was clumsily rather than dishonestly drafted, and ... counsel ha[d] ... acknowledged [the deficiency] ... and has assured us that [he] will not in the future make inadequately substantiated statements in court filings"); *see also Traina*, 911 F.2d at 1158. On the other hand, sanctions should be "sufficient to deter repetition of [similar] conduct". FED. R. CIV. P. 11(c)(2).

18

As the district court noted, the erroneous, racially-charged quotation should have been discovered through simple proofreading. Morever, as the court noted, even though the error was pointed out by opposing counsel in November 2003, Jenkins' attorney did *not* correct it until January 2004, roughly two months later, at the summary-judgment hearing.

Jenkins' attorney contends the court's delayed-correction statement in its opinion was one of the two bases for sanctions and that such a basis violated our court's "snapshot" rule, which "ensures that Rule 11 liability is assessed only for a violation existing at the moment of filing". *Skidmore Energy, Inc., v. KPMG*, 455 F.3d 564, 570 (5th Cir.), *cert. denied*, 127 S.Ct. 524 (2006). It is not clear whether it was a basis, or simply a factor that resulted in not mitigating against sanctions. In any event, such reliance on this "snapshot" rule is inapposite; the district court had already concluded the filing *never* satisfied Rule 11 to begin with, a fact never contested by Jenkins' attorney. *See generally id.* (sanctions upheld on similar grounds). Moreover, at most, this was but one of two bases relied upon in imposing sanctions, the other, as quoted above, being the attorney's "unprofessional conduct in not verifying the accuracy of the alleged quotation". *Jenkins*, 2004 WL 2871006, at * 2. Therefore, although Jenkins' attorney did not have a continuing duty to correct the misrepresentation, *see Edwards v. Gen. Motors Corp.*, 153 F.3d 242,

19

245 (5th Cir. 1998), his promptly doing so *might* have been considered by the district court as a mitigating factor. Jenkins' attorney did *not* take that obvious, and most appropriate, opportunity.

Pursuant to our quite deferential standard of review for sanctions, we are extremely mindful that district courts are "on the front lines of litigation". ***Cooter & Gell v. Hartmarx Corp.***, 496 U.S. 384, 404 (1990). As the district court noted, the error was glaring and could have had a serious impact on its summary-judgment decision. The court did *not* abuse its discretion in imposing the public-reprimand sanctions.

### III.

For the foregoing reasons, the judgment and sanctions are

***AFFIRMED.***