# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 23, 2009

Charles R. Fulbruge III
Clerk

No. 08-40262

Dr. Tone JOHNSON and COMPLETE MEDICAL CARE, PC

Plaintiffs-Appellants

v.

CHRISTUS SPOHN, et al.

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas
2:06-CV-138

Before GARWOOD, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Plaintiffs-appellants Tone Johnson, M.D. (Johnson) and Complete Medical Care, P.C. (Complete Medical Care) appeal the district court's summary judgment dismissal of their claims alleging that Dr. Johnson's medical staff membership and clinical privileges at defendant-appellee Christus Spohn Hospital (the Hospital) were unlawfully revoked. For the following reasons, we AFFIRM.

## I. FACTS AND PROCEEDINGS BELOW

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Dr. Johnson is an African-American physician and the sole owner of Complete Medical Care, a general family practice in Corpus Christi, Texas. Although not a Hospital employee, Dr. Johnson was a member of the medical staff and enjoyed clinical privileges there, meaning that he could admit and treat patients at the Hospital, for over twenty years at the time of the events underlying this suit. Dr. Johnson's medical staff membership and clinical privileges at the Hospital were suspended and eventually revoked following the death of a patient under his care. The legal issues in this case involve the peer review process that followed and whether Dr. Johnson's medical staff membership and clinical privileges were lawfully revoked.

On the morning of March 16, 2004, Dr. Reveron, an employee of Complete Medical Care, admitted patient RM to the Hospital for treatment through Dr. Johnson. Dr. Reveron suspected that RM was suffering from varicella (commonly known as chicken pox) and ordered lab tests to be performed, which indicated that RM had a low white blood cell count. Although Dr. Reveron ordered a hematology consult upon admitting RM, either through the fault of Dr. Johnson or the nursing staff, this initial request was never carried out. Dr. Johnson claims that he visited RM on March 16, whereas appellees assert that Dr. Johnson did not examine RM personally until the following evening.

Regardless, shortly after midnight on March 17, RM suffered a grand mal seizure. No action was taken until approximately 9:00 a.m., when Dr. Johnson requested that nurses contact several hematologists and neurologists, none of whom arrived until that evening. Concerned over her husband's treatment, RM's wife submitted a request that Dr. Johnson be removed from RM's care, which the charge nurse passed on to Dr. McCullough (Executive Vice President of the Medical Staff) and Dr. Cleaves (Chairman of the Department of Family Practice). When informed of this complaint, Dr. Johnson responded that RM

2

was "2x stupid" and that he was being singled out because of his race. Following an examination by a hematologist and Dr. Johnson at around 7 p.m. that evening, RM was immediately transferred to the intensive care unit, where he was intubated and placed on a ventilator. Soon thereafter, RM's wife requested that Dr. Johnson be removed as treating physician and Dr. Johnson either removed himself or was involuntarily removed. Despite the efforts of several specialists, RM died on the morning of March 19, 2004.

At a regularly-scheduled meeting held on March 25, 2004, the Hospital's Medical Executive Committee (MEC), which was comprised of approximately thirty physicians responsible for overseeing the quality of medical care at the Hospital and recommending disciplinary action to the Christus Spohn Board of Directors (Board of Directors), heard reports from Dr. McCullough, who also served on the MEC, and another family practitioner about the events leading up to RM's death. Although Dr. Cleaves was unable to attend the meeting, he was a member of the MEC and recommended that Dr. Johnson's privileges be suspended. The MEC voted to suspend Dr. Johnson's privileges and to appoint a Departmental Action Committee (DAC) composed of five physicians from the Department of Family Practice, including Dr. Cleaves, to investigate further. Dr. Johnson was promptly informed that his privileges were summarily suspended and that he would be granted an "interview" to present his side of the story to the DAC. Pursuant to Dr. Johnson's request, the MEC met again on April 1, 2004 to hear personally from Dr. Johnson and unanimously voted to continue his suspension pending the DAC's investigation.

At a meeting of the DAC held on April 7, 2004, Dr. Johnson, without the aid of counsel, was permitted to explain his treatment of RM and to refute the allegations of substandard care. The DAC also heard from several other doctors and Hospital staff who were on duty at the time that RM was being treated.

3

With Dr. Cleaves abstaining, the DAC unanimously voted to continue the suspension and recommended revocation of Dr. Johnson's medical staff membership and clinical privileges. On April 22, 2004, the MEC adopted the DAC's findings and made the same recommendation to the Board of Directors.

Thereafter, in accordance with the Medical Staff Bylaws,[1] Dr. Johnson requested review by a Fair Hearing Committee. At several hearings held between April and July of 2005, Dr. Johnson was represented by counsel, presented evidence, and called and cross-examined witnesses. On July 14, 2005, the Fair Hearing Committee, which was comprised of five of Dr. Johnson's fellow physicians, unanimously concluded that Dr. Johnson had failed to meet the burden imposed by the Medical Staff Bylaws of showing by clear and convincing evidence that the MEC's decision lacked "substantial factual basis or that such basis and the conclusions drawn therefrom [were] arbitrary, unreasonable, and capricious." The MEC voted to affirm its recommendation on July 28, 2005, and Dr. Johnson appealed to the Appellate Review Body. After hearing oral argument from the Hospital and Dr. Johnson's counsel, the six person Appellate Review Body unanimously concluded that "(a) this matter has been handled in substantial compliance with the Hospital Bylaws, (b) the decision of the hearing committee was based upon the evidence presented to it, and (c) the hearing committee decision was reasonable in light of the hospital's duty to its patients." Further, the Appellate Review Body specifically found that the revocation was not based upon race and that Dr. Johnson was afforded a fair hearing and a full opportunity to present his case. Finally, on November 18, 2005, the Board of Directors reviewed the Appellate Review Body's decision and voted to adopt the

---

[1]The procedures for conducting a peer review were contained within the Hospital's "Credentials Policy and Procedure Manual," which was incorporated by reference into the Medical Staff Bylaws.

MEC's recommendation to revoke Dr. Johnson's medical staff membership and clinical privileges.[2]

On March 24, 2006, Dr. Johnson and Complete Medical Care filed this suit in the Southern District of Texas against the Hospital and the various individual administrators and several physician members of the MEC and DAC, asserting the following claims: violations of federal and Texas antitrust laws; violations of the Texas Deceptive Trade Practices Act; breach of contract; various state torts, including business disparagement, defamation, slander, libel, tortious interference with contract, intentional infliction of emotional distress, fraud, and misrepresentation; violations of the constitutional rights to free speech, due process, and equal protection; and race discrimination in violation of 42 U.S.C. § 1981. The district court concluded that, as to all but the section 1981 claim, appellees were immune from civil liability under the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101 *et seq.*, and its Texas counterpart, the Texas Health Care Quality Improvement Act, TEX. OCC. CODE ANN. §§ 160.001 *et seq.* In regard to the section 1981 claim, the district court determined that appellants had failed to create a genuine issue of material fact as to whether the Hospital's proffered reason for the revocation of Dr. Johnson's privileges was a pretext for an underlying discriminatory motive or that race was a motivating factor in the decision. Therefore, the district court granted summary judgment for appellees as to all claims. Dr. Johnson and Complete Medical Care timely appealed.

---

[2]We also note that, well after the revocation of Dr. Johnson's privileges at the Hospital, he was also disciplined by the Texas State Board of Medical Examiners for his role in treating RM. The Board of Medical Examiners determined that Dr. Johnson had failed to observe the required standard of care under Texas law, therefore it imposed a one-year probated suspension of Dr. Johnson's license. Dr. Johnson has apparently appealed those sanctions in state court proceedings that are still pending.

## II. DISCUSSION

*A. Standard of Review*

We review a grant of summary judgment *de novo*, applying the same standards as the district court. *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 260 (5th Cir. 2007). In doing so, we view the evidence in the light most favorable to the non-movant. *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 339 (5th Cir. 2002). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

*B. Summary Judgment Evidence*

Appellants claim that the district court erred in overruling their evidentiary objections and therefore improperly relied on three categories of allegedly inadmissable evidence: a timeline of the events leading up to RM's death created by Hospital personnel for trial; affidavits from numerous individuals involved in RM's treatment and the peer review process stating that Dr. Johnson's care for RM was substandard and that the revocation proceedings were fair; and various notes, letters, and committee minutes created during the peer review process. Evidence that is inadmissable at trial may not be relied upon at the summary judgment stage. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991). Unauthenticated documents may not be used, but "discovery and disclosure materials on file, and any affidavits" may be relied upon. *Id.*; FED. R. CIV. P. 56(c). We review a district court's evidentiary rulings for abuse of discretion. *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 562 (5th Cir. 1998).

As part of their summary judgment evidence, appellees introduced a timeline purporting to show the sequence of events leading up to RM's death.

Appellants argue that, because the timelime was created after-the-fact and never relied upon by any of the review committees, it was irrelevant for the purposes of evaluating what evidence those committees considered. Although the timeline itself was not considered by the review committees, it nevertheless assisted the district court in understanding the other evidence considered by those committees. Moreover, the timeline was accompanied by the affidavits of seven physicians and hospital staff members who had personal knowledge of the events described therein and attested to the accuracy of that information. The district court did not abuse its discretion in admitting the timeline for summary judgment purposes.

The second category of challenged evidence includes twenty affidavits submitted by persons either involved in RM's treatment or in the peer review process stating, among other things, that Dr. Johnson's treatment of RM was below the required standard of care and that the review process was fair. Appellants claim that the statements contained in those affidavits were conclusory and their objections should have been sustained. Affidavits setting forth "ultimate or conclusory facts and conclusions of law" are insufficient of themselves to support a grant of summary judgment. *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985). The district court overruled these objections as moot because the court did not rely on those statements in granting summary judgment for appellees. Because the district court did not take those statements into consideration and there is ample additional evidence to support the district court's conclusions, we find no error.

Finally, appellants argue that the various notes, letters, and committee minutes created during the peer review process contained hearsay and should not have been admitted. To authenticate those documents, appellees submitted the affidavit of Dr. Davis, who was Vice President of Medical Affairs at the

7

Hospital and served as the Hospital's representative throughout the entire peer review process. Dr. Davis attested that the documents were business records compiled at the time of the hearings during the regular course of business by individuals with personal knowledge of the information contained therein. *See* FED. R. EVID. 803(6). Given Dr. Davis's position at the Hospital and his attendance at most, if not all, of the hearings, we conclude that the district court did not err in admitting those documents as properly authenticated business records. Moreover, as the district court correctly observed, those documents were also admissible for the non-hearsay purposes of "showing what evidence the Medical Executive Committee considered, what actions were taken by Defendants, whether the procedures taken were fair and whether the committee members reasonably believed they were acting to further quality healthcare." Therefore, we find that the district court did not abuse its discretion in refusing to exclude the various documents created during the peer review proceedings.

Ultimately, district courts are afforded broad discretion on evidentiary matters. *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 927 (5th Cir. 2006). The district court did not abuse its discretion here.

B. *Immunity under the Health Care Quality Improvement Act*

With the exception of appellants' section 1981 claim, the district court dismissed all other claims against appellees pursuant to the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §§ 11101 *et seq.* Congress enacted the HCQIA to prevent malpractice, to improve the quality of healthcare, and to ensure that incompetent physicians would be prevented from "mov[ing] from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101(1)–(2). The HCQIA seeks to promote these goals through professional peer review, which it accomplishes in part by limiting the civil liability of the physicians,

8

administrators, and health care entities involved in professional review actions. *Id.* § 11101(3)–(5).

To that end, the HCQIA provides that, if certain standards are met, participants in a peer review process that results in a "professional review action"[3] "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action." *Id.* § 11111(a)(1). In order for immunity to attach under the HCQIA, the professional review action must be taken

> "(1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)."

*Id.* § 11112(a). Further, the statute expressly provides that it *"shall be presumed"* that these standards have been met, unless the presumption is rebutted by a preponderance of the evidence. *Id.* (emphasis added).[4] Thus, we apply an "unusual" standard of review to a grant of summary judgment under

---

[3]The HCQIA defines a "professional review action" in part as "an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician." 42 U.S.C. § 11151(9). In this case, it is undisputed that the Medical Executive Committee's recommendation to revoke Dr. Johnson's medical staff membership and clinical privileges met this definition.

[4]Section 11112(a) concludes by stating:
"A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence."

9

the HCQIA's immunity provision, which the Eleventh Circuit has articulated as follows: "'whether [the plaintiff] provided sufficient evidence to permit a jury to find that he ha[d] overcome, by a preponderance of the evidence, the presumption that [the Hospital] would reasonably have believed' that it had met the standards of section 11112(a)." *Bryan v. Homes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333-34 (11th Cir. 1994) (quoting *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir. 1992)); *see also Van v. Anderson*, 199 F. Supp. 2d 550, 571 (N.D. Tex. 2002), *aff'd*, 66 F. App'x 524 (5th Cir. Apr. 14, 2003) (per curiam).

The district court held that appellees had met the requirements of section 11112(a) and therefore they were entitled to immunity as to all claims except the section 1981 claim, which is specifically exempted from immunity under the statute. *See id.* § 11111(a)(1). Appellants assert that appellees failed to satisfy any of the standards laid out in section 11112(a). In doing so, appellants spend much of their briefs arguing contested factual matters and challenging the merits of the MEC's decision. However, we remind appellants that the "[t]he intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." *Bryan*, 33 F.3d at 1337 (internal citation and quotations omitted). Therefore, our role is not to second-guess the merits of the MEC's decision, but rather to consider whether the procedures afforded were fair and whether the members of the MEC made a reasonable investigation and a reasonable decision based on the facts before them. *See* 42 U.S.C. § 11112(a).

*i. Furtherance of Quality Health Care*

In determining whether members of the MEC acted "in the reasonable belief that the action was in the furtherance of quality health care," we apply an

10

objective "totality of the circumstances" test. *See Poliner v. Tex. Health Sys.*, 537 F.3d 368, 378 (5th Cir. 2008). In doing so, we consider whether "'the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.'" *Id.* (quoting *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 468 (6th Cir. 2003)).

Appellees clearly met this standard. The peer review action was prompted by the death of a patient under Dr. Johnson's care. The MEC members were presented with evidence suggesting that Dr. Johnson had failed to examine the patient in a timely manner, that he had failed to order a necessary hematology consult, that he had been inaccessible to nursing staff attempting to confirm orders, and that his interactions with RM and his wife had grown so acrimonious that she requested that he be removed as treating physician. Given this evidence, the MEC clearly acted in the reasonable belief that suspension and revocation of Dr. Johnson's privileges "would restrict incompetent behavior or would protect patients." *See id.* Appellants have failed to overcome the presumption that the MEC members reasonably believed that revocation of Dr. Johnson's privileges would further quality health care at the Hospital.

*ii. Reasonable Effort to Obtain the Facts*

The HCQIA also requires that peer reviewers make "a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2). Appellants contend that appellees suspended and revoked Dr. Johnson's privileges and medical staff membership without conducting a reasonable investigation. We disagree.

The record reveals that the MEC conducted a reasonable investigation prior to making its final decision. At the initial meeting held on March 25, 2004, the MEC heard the testimony of two of Dr. Johnson's fellow physicians with first-hand knowledge regarding Dr. Johnson's care for RM. Further, the

11

committee members considered the recommendation of Dr. Cleaves, who, as head of the Department of Family Care, was familiar with the events leading up to RM's death. This information was sufficient to warrant a temporary suspension and the appointment of a DAC to investigate further. Dr. Johnson was also granted the requested interview to present his own side of the facts to the MEC in a meeting held on April 1, 2004.

At the DAC hearing held on April 7, 2004, in addition to considering RM's medical records, committee members heard from Dr. McCullough, Dr. Cleaves, and the shift supervisor and charge nurse on duty at the time of RM's treatment. Dr. Johnson was again allowed to give his version of events. The DAC's factual findings were eventually adopted by the MEC when it recommended revocation of Dr. Johnson's privileges on April 22, 2004. The Fair Hearing Committee, which heard further testimony and reviewed the evidence relied upon by the MEC, eventually concluded that the MEC's decision was supported by the facts. Finally, the Appellate Review Body determined that the Fair Hearing Committee's decision was reasonably based on the facts presented to it. Thus, the Hospital's internal appellate process further confirmed that the MEC's efforts to investigate were reasonable. Therefore, we conclude that appellants have not presented sufficient evidence to overcome the presumption that the MEC made a reasonable effort to obtain the facts.

*iii. Adequate Notice and Hearing Procedures*

For immunity to attach under the HCQIA, the professional review action must be taken "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." *Id*. § 11112(a)(3). Section 11112(b) lists a number of procedures that, if followed, constitute a "safe harbor" under which the requirements of section 11112(a)(3) are deemed to be met. *Poliner*, 537 F.3d at

12

381–82. Appellants do not claim that Dr. Johnson received insufficient notice, but rather that the procedures provided by the Hospital were inadequate and unfair. Thus, the safe harbor provisions relevant to this case are as follows:

(b) Adequate notice and hearing
A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):
**\*\*\*\***
(3) Conduct of hearing and notice
If a hearing is requested on a timely basis under paragraph (1)(B)—
**\*\*\*\***
(C) in the hearing the physician involved has the right—
> (i) to representation by an attorney or other person of the physician's choice,
> (ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,
> (iii) to call, examine, and cross-examine witnesses,
> (iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and
> (v) to submit a written statement at the close of the hearing.
> . . .
**\*\*\*\***
A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.

42 U.S.C. § 11112(b). Thus, observing the procedures listed in section 11112(b)(3) ensures that section 11112(a)(3) is satisfied. However, the statute makes clear that the safe harbor examples are not mandatory, and any procedures that are "fair to the physician under the circumstances" will suffice. *See id.* § 11112(a)(3).

Additionally, section 11112(c) provides two exceptions where adequate notice and hearing procedures are not required: (1) "in the case of a suspension

13

or restriction of clinical privileges, for a period of not longer than 14 days, during which an investigation is being conducted to determine the need for a professional review action"; and (2) in the case of "an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual." *Id.* §§ 11112(c)(1)(B), (c)(2).

Appellants first argue that Dr. Johnson was not provided with adequate notice and hearing procedures prior to his initial suspension and that appellees' actions do not fall within the exceptions in section 11112(c). We disagree. Section 11112(c)(1)(B) authorized the suspension of Dr. Johnson's privileges for the thirteen days that the investigation was being conducted between his initial suspension on March 25, 2004 and the DAC hearing on April 7, 2004. Nevertheless, appellants maintain that the investigation continued past the fourteen-day limit in section 11112(c)(1)(B), because the MEC did not make its final recommendation to revoke Dr. Johnson's privileges until April 22, 2004.

Even assuming this is true and that the DAC hearing did not represent the end of the MEC's investigation, Dr. Johnson's continued suspension was justified under the "imminent danger" exception in section 11112(c)(2). While discussing this provision in *Poliner*, we cited with approval to the district court's decision in the instant case, which held that "[b]ased on the purportedly negligent treatment of RM, the Court has little trouble finding Dr. Johnson's summary suspension was appropriately based on the reasonable belief he failed to care for a patient and thus may have represented an imminent danger to the health of an individual." 537 F.3d at 383 n.47 (quoting *Johnson v. Christus Spohn*, No. C–06–138, 2008 WL 375417, at *12 (S.D. Tex. Feb. 8, 2008)) (alteration omitted). We agree with the district court's assessment. As we noted

14

in *Poliner*, "the process provisions of the HCQIA work in tandem: legitimate concerns lead to temporary restrictions and an investigation; an investigation reveals that a doctor may in fact be a danger; and in response, the hospital continues to limit the physician's privileges." *Id*. at 384. This is precisely what happened here; therefore, whatever procedural failings may have accompanied Dr. Johnson's initial suspension were authorized under section 11112(c).

Even under the imminent danger exception, however, appellees were required to grant Dr. Johnson due process protections *at some point* prior to the final revocation of his medical staff membership and clinical privileges. At the meetings held by the MEC and the DAC between March 25, 2004 and April 22, 2004, the Hospital essentially formulated an advisory recommendation to the Board of Directors. Although Dr. Johnson was permitted to speak before the committees, he was not afforded the right to counsel or any other procedural protections. Later, however, when Dr. Johnson appeared before the Fair Hearing Committee, the Medical Staff Bylaws granted, and Dr. Johnson was afforded, the right to representation by counsel, to examine and cross-examine witnesses, to present and rebut evidence, to request a record of the hearing, and to submit a written statement at the close of the hearing.[5]

Appellants complain that, at that point in the proceedings, Dr. Johnson's burden of proof was so high as to deny him an adequate hearing under section 11112(a)(3). Before the Fair Hearing Committee, Dr. Johnson had the "burden of proving, by clear and convincing evidence, that the adverse recommendation or action lack[ed] any substantial factual basis or that such basis and the conclusions drawn therefrom [we]re arbitrary, unreasonable, and capricious."

---

[5]Dr. Johnson also exercised all these rights, with the possible exception that he may have failed to submit a written statement at the close of the hearing.

Similarly, the Medical Staff Bylaws limited the Appellate Review Body's review of the Fair Hearing Committee's decision to considering only: "(a) Whether there has been substantial compliance with the Bylaws; (b) Whether the decision of the hearing committee was based upon the evidence presented to the hearing committee; [and] (c) Whether the hearing committee decision was reasonable in light of the hospital's duty to patients."

Thus, appellants contend that Dr. Johnson was denied procedural protections at the most critical stage of the proceedings, when the merits were decided, and that the due process afforded later could not remove the "taint" of the earlier proceedings. We reject this argument. The HCQIA requires that procedural protections be afforded at some point in the proceedings, but it does not specify *when*. Moreover, neither section 11112(a)(3) nor the safe harbor provisions in section 11112(b)(3) speak to the burden of proof that should be applied in peer review actions. Finally, these procedures were those specified in the Medical Staff Bylaws, and they were only required to be "fair . . . under the circumstances." *See* 42 U.S.C. § 11112(a)(3).

We note that other courts have found the adequate notice and hearing requirement in section 11112(a)(3) to be satisfied in cases involving nearly identical peer review procedures and similar burdens of proof. *E.g.*, *Bryan*, 33 F.3d at 1336; *Bhatt v. Brownsville Gen. Hosp.*, No. 2:03–CV–1578, 2006 WL 167955, at *25–26 (W.D. Pa. Jan. 20, 2006) (unpublished), *aff'd*, 236 F. App'x 764 (3d Cir. 2007) (per curiam). For instance, in *Bryan* the executive committee was charged with making a recommendation to the board of directors regarding whether sanctions should be imposed against the physician. 33 F.3d at 1324. The physician then had the right to request a hearing, at which point he was "entitled to representation, and ha[d] full rights of cross-examination and confrontation of witnesses." *Id*. at 1325. Significantly, at that hearing the

16

physician had the burden of proving "that the recommendation which prompted the hearing was unreasonable, not sustained by the evidence, or otherwise unfounded." *Id*. The Eleventh Circuit held that these procedures were adequate and met the safe harbor provisions under section 11112(b). *Id*. at 1336.

Similarly, in *Bhatt*, the physician was afforded counsel and other procedural protections when he appeared before the Fair Hearing Committee, which was charged with reviewing the MEC's decision to revoke his privileges. 2006 WL 167955, at *2–3. At that hearing, the physician had the burden "to prove, by a preponderance of the evidence, that the grounds for the [MEC's] recommendation lacked any substantial factual basis or that the basis or conclusions drawn therefrom were arbitrary, unreasonable, or capricious." *Id*. at *3. The district court, whose decision was affirmed by the Third Circuit, concluded that the hearing was adequate under the safe harbor provisions in section 11112(b)(3)(C). *Id*. at *26.

Likewise, we conclude that the procedures provided by the Hospital satisfied the safe harbor requirements in section 11112(b)(3)(C). Dr. Johnson was afforded the right to counsel, the right to have a record made of the proceedings, the right to call and cross-examine witnesses, the right to present evidence, and the right to submit a written statement at the end of the hearing. Indeed, it appears that the Medical Staff Bylaws were intentionally drafted to mirror the safer harbor provisions in section 11112(b)(3)(C). The fact that these procedural protections were not provided until Dr. Johnson appeared before the Fair Hearing Committee does not render them inadequate. And although Dr. Johnson's burden of proof was "clear and convincing evidence" and therefore slightly more onerous than those faced by the physicians in *Bryan* and *Bhatt*, we do not believe that imposing such a burden violated the strictures of section 11112(a)(3). Ultimately, Dr. Johnson's case was considered by five separate peer

17

review bodies—the MEC, the DAC, the Fair Hearing Committee, the Appellate Review Body, and the Board of Directors—in a peer review process that lasted over one and a half years. We find that the procedures provided by the Hospital were adequate, and that therefore appellants have failed to overcome the presumption that the Hospital satisfied the requirements of 11112(a)(3).

### iv. *Reasonable Belief that the Action Was Warranted by the Facts*

Finally, section 11112(a)(4) requires that, after a reasonable investigation and adequate hearings, a professional review action be taken in the "reasonable belief that the action was warranted by the facts." Essentially, appellants contest the factual findings of the MEC and assert that it was unreasonable for the MEC not to accept Dr. Johnson's version of events. Further, appellants claim that revocation of Dr. Johnson's medical staff membership and clinical privileges was too harsh under the circumstances and thus unwarranted by the facts. As stated above, we will not substitute our own judgment for that of Dr. Johnson's colleagues, who are much more qualified to make decisions regarding the adequacy of medical treatment and professional competency. *See Bryan*, 33 F.3d at 1337. The MEC found that Dr. Johnson had failed to attend to RM promptly, failed to provide urgently needed medical care, was unavailable to Hospital staff, and was unresponsive to the needs of RM and his family, all of which ultimately may have contributed in some fashion to RM's death. Certainly, under these facts the MEC members could have reasonably believed that revocation of Dr. Johnson's privileges was warranted, and appellants have failed to overcome the presumption that they acted in that belief.

### v. *Appellees Are Immune under the HCQIA*

We conclude that appellants have failed to meet their burden of demonstrating that a reasonable jury could find, by a preponderance of the evidence, that appellees did not satisfy the requirements of section 11112(a) of

18

the HCQIA. Because we find that appellees are immune from liability pursuant to the HCQIA, we need not consider whether they are also immune under the Texas Health Care Quality Improvement Act, TEX. OCC. CODE ANN. 160.001 *et seq*.

*D. Race Discrimination under Section 1981*

The HCQIA specifically excludes civil rights claims from immunity, including those brought under 42 U.S.C. § 1981 *et seq*. 42 U.S.C. § 11111(a)(1). Therefore, we consider separately appellants' assertion that appellees violated Dr. Johnson's contractual rights under 42 U.S.C. § 1981.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute defines the phrase to "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

In analyzing appellants' section 1981 claim, the district court correctly employed the modified *McDonnell Douglas* burden-shifting framework.[6] *See Jenkins*, 478 F.3d at 260–61; *see also Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). First, appellants were required to establish a *prima facie* case of intentional discrimination. *See Jenkins*, 478 F.3d at 260. To do so, appellants had to demonstrate that (1) Dr. Johnson was a member of a racial minority; (2) appellees intended to discriminate on the basis of race; and (3) the discrimination concerned the making and enforcing of a contract. *See id*. at 260–61 (citing *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997)).

---

[6] *McDonnell Douglas Corp. v. Green*, 93 S.Ct. 1817 (1973).

Next, appellees were required to present a legitimate, non-discriminatory reason for revoking Dr. Johnson's privileges. *See id*. at 261. Finally, appellants had to show either that the proffered reason was merely a pretext for discrimination or that Dr. Johnson's race was a motivating factor in the decision, meaning that "his race 'actually played a role in [the Hospital's decision-making] process and had a determinative influence on the outcome.'" *See id*. at 261 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S.Ct. 2097, 2105 (2000)) (alteration in original). At all times, the ultimate burden of proof remained on appellants to create a genuine issue of material fact as to whether Dr. Johnson's privileges were revoked due to intentional race discrimination. *See id*. at 261.

We first consider whether appellants met their burden of establishing a *prima facie* case. Although Dr. Johnson was not a Hospital employee, appellants claim that Dr. Johnson's clinical privileges, bestowed on him by virtue of the Medical Staff Bylaws,[7] constituted a contractual right of which he was unlawfully deprived. To determine whether a contract existed between Dr. Johnson and the Hospital, we look to Texas law. In Texas, *hospital* bylaws can create contractual rights in favor of doctors, whereas *medical staff* bylaws generally do not. *Stephan v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 887–88 (Tex. App.—Dallas 2000, no pet.). In *Stephan*, the court found that the medical staff bylaws at issue did not grant the doctor the contractual right to receive an application to reapply for hospital privileges. *Id*. at 888. After observing that the medical staff and the hospital were distinct entities, the court considered the nature of the hospital board's authority in relation to the medical

---

[7]As with the procedures observed during the revocation process, Dr. Johnson's privileges were granted pursuant to the Hospital's "Credentials Policy and Procedure Manual," which, as noted above, was incorporated by reference into the Medical Staff Bylaws.

staff bylaws:

> "[T]he preamble to [the hospital's] medical staff bylaws recognizes that the staff 'is subject to the ultimate authority of the board.' The medical staff bylaws do not attempt to define or limit [the hospital's] power to act through its board of trustees. Bylaws that do not define or limit the power of a hospital as it acts through its governing board do not create contractual obligations for the hospital. This is true despite the fact that the board may have approved and adopted the staff bylaws."

*Id.* (internal citation omitted). Therefore, the court concluded that the medical staff bylaws created no contractual rights on behalf of the doctor, because the staff bylaws were not binding on the hospital itself. *Id.*

Federal courts applying Texas law have also found that medical staff bylaws do not generally create contractual rights in favor of doctors. *E.g., Van*, 199 F. Supp. 2d at 562–63; *Monroe v. AMI Hosps. of Tex.*, 877 F. Supp. 1022, 1029 n.5 (S.D. Tex. 1994). In *Van*, which was affirmed by this court, the district court relied on the preamble to the medical staff bylaws in determining that those bylaws did not create contractual rights on the part of the plaintiff physician. *See* 199 F. Supp. 2d at 563. The district court observed that:

> "[T]he Medical Staff Bylaws in place at the Hospital provided in their preamble that the medical staff was 'responsible for the quality of medical care in the hospital and for the ethical conduct and professional practices of its members and must accept and discharge this responsibility, *subject to the ultimate authority of the hospital Governing Body . . . .*"

*Id.* (emphasis in original). The court also noted that "although the various hospital committees, including the Executive Committee, were charged with making *recommendations* on a member's reappointment application under the medical staff's bylaws, . . . the final authority on this decision rested solely with the Hospital's Governing Body." *Id.* at 563–64 (emphasis added). Therefore, the

21

district court found that "no contract was created between Plaintiff and the Defendant Hospital simply by virtue of the fact that Dr. Van had been granted staff privileges at the hospital," and thus Dr. Van could not recover under section 1981. *Id.* at 564–65.

Similarly, in this case the preamble to the Medical Staff Bylaws limits the authority of the medical staff, and therefore the Medical Staff Bylaws themselves, to bind the Board of Directors:

> "There shall be an organized and self governing Medical Staff to which is delegated by the Governing Board the overall responsibility for the quality of professional services and the ethical and professional practice provided by members of the Medical Staff and other individuals with clinical privileges. The activities of the Medical Staff in fulfilling these responsibilities are *subject to final review and approval of the Governing Board.*"

(emphasis added). Additionally, as was the case in *Van*, none of the peer review committees in this case had the power to make a final decision in Dr. Johnson's case that would bind the Board of Directors. Rather, the MEC, the Fair Hearing Committee, and the Appellate Review Body could only make recommendations to the Board of Directors, which retained the ultimate authority over Dr. Johnson's fate. Therefore, because we find that the clinical privileges bestowed upon Dr. Johnson under the Medical Staff Bylaws did not give him any contractual rights, we hold that appellants have failed to establish a *prima facie* case under section 1981. *See Jenkins*, 478 F.3d at 260.[8]

Moreover, even if we were to assume, as the district court did, that appellants established a *prima facie* case, we conclude that appellants' section

---

[8]The case relied on by appellants, *Gonzalez v. San Jacinto Methodist Hosp.*, 880 S.W.2d 436, 438 (Tex. App.–Texarkana 1994; writ denied), involved the bylaws of the Hospital itself, not Medical Staff bylaws (and in any event no actionable violation was found).

1981 claim would still fail as a matter of law. Appellees have presented a legitimate, non-discriminatory reason for the revocation of Dr. Johnson's privileges: namely, that Dr. Johnson's provision of substandard medical care posed a danger to patient safety. We find that appellants have not satisfied their ultimate burden of presenting sufficient evidence such that a reasonable jury could find that appellee's justification for revoking Dr. Johnson's privileges was a pretext for discrimination or that race was a motivating factor in the decision.

Appellants' strongest evidence consists of statements made by the Chairman of the MEC, Dr. Acebo, who allegedly told Dr. Johnson during the peer review process: "I guess you are being made an example of. Man, I thought they were going to drop this for sure. It looks like it's because you're black. They wouldn't be doing this to someone white or Hispanic, you know." Later, when appearing as a witness before the Fair Hearing Committee, Dr. Acebo admitted to previously stating under oath that "if Dr. Johnson was not black, things may have been a little different." In a subsequent deposition, Dr. Acebo attempted to clarify his previous statements, observing that Dr. Johnson was "probably" treated more severely because of his personality, which, in his mind, was affected by Dr. Johnson's race, *i.e.*, "black man with an attitude." As Chairman of the MEC, Dr. Acebo did have some authority over that particular committee's decision, but he was only one of the dozens of doctors that reviewed Dr. Johnson's case. *See id.* at 262. Moreover, Dr. Acebo testified that he was one of only two or three committee members who actually advocated *lesser* sanctions, and he was not even present at the July 28, 2005 meeting at which the MEC accepted the Fair Hearing Committee's report and made its final recommendation to the Board of Directors to revoke Dr. Johnson's privileges. Thus any discriminatory animus that he himself may have harbored did not

23

contribute to the revocation of Dr. Johnson's privileges. In the end, Dr. Acebo's remarks amount to nothing more than mere speculation as to the motives of the other committee members, which Dr. Acebo admitted was founded solely on his own personal opinion. Dr. Acebo testified that his suspicions were based on his knowledge of two other unspecified peer review proceeding in which unnamed white doctors were not punished as severely as Dr. Johnson. Other than the very briefest generic descriptions, there is no evidence regarding the circumstances of those wholly unidentified peer review actions (or the conduct charged against the doctor or doctors or the severity of any results thereof). As we observed in *Jenkins*, mere "opinions, with *no* supporting evidence," that a suspension or revocation of privileges was based on race are insufficient to support a claim of discrimination. *See id*. at 262 (emphasis in original).

Appellants also allege that Dr. McCullough complained a few months before the peer review that Dr. Johnson "took his place in medical school," thus allegedly demonstrating his resentment toward African-American doctors. Further, appellants claim that when Dr. Johnson arrived at the Hospital over twenty years ago, Dr. Cleaves indicated that he did not wish to practice in the same building as Dr. Johnson because of his race. As these alleged statements are removed in time and substance from the peer review process, we find them to be mere "stray remarks," which are insufficient to support a section 1981 claim. *See id*. at 261–62. Appellants' assertion that the MEC was "all-white" is not correct, as the record reflects that the committee included several Hispanic and Indian doctors. Finally, other than Dr. Acebo's unsubstantiated suspicions, appellants provide no proof for their assertion that Dr. Johnson was treated more severely than a white doctor would have been under similar circumstances.

Therefore, we hold that appellants have failed to present sufficient evidence for a reasonable jury to conclude that appellees violated section 1981

when they revoked Dr. Johnson's clinical privileges. Appellants have not established a contractual relationship that would support a claim under section 1981, nor have they created a fact issue as to whether appellees' proffered reason for revoking Dr. Johnson's privileges was pretextual or that race was a motivating factor in the decision.

## III. CONCLUSION

We find that the district court did not abuse its discretion in overruling appellants' evidentiary objections. We also conclude that the district court did not err in granting appellees immunity under the HCQIA. Finally, we hold that the district court correctly dismissed appellants' section 1981 claim because: (1) appellants failed to establish that the Hospital breached his contractual rights; and in any event (2) appellants failed to demonstrate that the proffered reason for the revocation of Dr. Johnson's privileges was pretextual or that race was a motivating factor in the decision. Therefore, the district court's judgment is

AFFIRMED.